American National Bank and Trust Company, a Corporation, Guardian of the Estate of Henry Lee Edwards, a Minor, Plaintiff-Appellee, v. The Pennsylvania Railroad Company, a Corporation; The Philadelphia, Baltimore and Washington Railroad Company, a Corporation, Defendants-Appellants, Chicago, Milwaukee, St. Paul and Pacific Railroad Company, a Corporation, Defendant.

### Gen. No. 49,221.

First District, Second Division.

October 16, 1964.

Rehearing denied November 5, 1964.

Cornelius P. Callahan, Jr., of Chicago, for appellants.

Louis G. Davidson, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court:

This is an action to recover damages for personal injuries suffered by a thirteen-year-old boy when he

was run over by a Chicago, Milwaukee, St. Paul and Pacific Railroad Company train and suffered a traumatic amputation of both his legs. Suit was brought against three railroads: The Chicago, Milwaukee, St. Paul & Pacific Railroad Company, hereinafter referred to as the Milwaukee Railroad, the Pennsylvania Railroad Company and the Philadelphia, Baltimore & Washington Railroad Company, hereinafter jointly referred to as the Pennsylvania Railroads. Henry Lee Edwards, the minor on whose behalf this suit was instituted, shall be referred to as the plaintiff.

The amended complaint contained two counts. Count I charged the Pennsylvania Railroads with failure to comply with the fencing requirements of a City of Chicago special ordinance passed on January 18, 1897, and the Milwaukee Railroad with proximately contributing to plaintiff's injuries through the negligent operation of its train. Count II charged the Pennsylvania Railroads with common law negligence in failing to take reasonable precautions where serious harm to children was foreseeable, and the Milwaukee Railroad again with proximately contributing to plaintiff's injuries through the negligent operation of its train.

The jury returned a general verdict for the plaintiff against all three defendants for $275,000 and the court entered judgment on the verdict. Post-trial motions on behalf of all the defendants were denied. The Milwaukee Railroad has paid the plaintiff the sum of $75,000 for a covenant not to enforce the judgment against it. The Pennsylvania Railroads bring this appeal.

The accident occurred on June 12, 1959, on an elevated railroad embankment at Rockwell and Van Buren Streets in the City of Chicago. There were five railroad tracks on the embankment where the accident occurred, which ran in a north-south direction. The two easterly tracks were owned and controlled

by the appellants and they operated their trains on those tracks. On a user basis, charging so much per car, appellants also leased these tracks to a number of other railroads, including the Milwaukee Railroad. The accident occurred on Pennsylvania track two, the second track from the east. The third and fourth tracks from the east were owned by the Chicago and Northwestern Railroad, and it and other railroads used those tracks. The fifth or most westerly track was little used and is not involved here. Each track passes between large girders as it crosses over each underpass; these girders are six or seven feet high and about a foot and a half wide. The distance between the running board of a tank car and the top of one of the girders is only four to six inches.

Van Buren and Rockwell Streets, where the tracks in question are located, are in a heavily populated area of the City of Chicago; this has been the condition for many years. Within a few years prior to the accident in 1959, a housing project containing eight to ten story buildings has been constructed immediately east of the railroad tracks between Van Buren Street on the south and Jackson Boulevard on the north; there were a number of large apartment buildings in that area between the railroad tracks on the west and Western Avenue on the east. For many years a much used public playground was located immediately west of the railroad elevation, on the south side of Congress Street. Congress Street is a short block south of Van Buren Street. This large playground, known as Altgeld Park, contained several ball fields, swings and other playground equipment, and was extremely popular in that neighborhood. A lighting system had been provided and the playground was used in the evenings as well as in the day time.

Trains often stopped or moved very slowly through the area in question because of heavy train traffic,

switching or stopboard signals. Trains sometimes moved at speeds as slow as a walk. The speed was limited to 15 or 20 miles an hour.

For many years youngsters ranging in age from about six to sixteen years of age frequently went up a pathway on the east side of the sloping embankment at the north side of Van Buren Street. From there the children went southwards upon the elevation and crossed over Congress (now the Eisenhower) Expressway to the playground, or went north by the same route from the playground to Van Buren Street or Jackson Boulevard. This occurred daily. The youngsters played on the tracks and often climbed on the standing trains, or got on slowly moving trains, rode a short distance, jumped off, and had a good time.

This use of the elevation between Jackson Boulevard and Congress Street as a means of passage to and from the playground became more extensive after Congress Expressway was built and fenced on both sides because the only way youngsters could go to the playground from the north side of Van Buren Street near Rockwell Street was either by using the direct route along the elevated embankment as a passageway, or by going an extra half mile via the bridges or crossings at Western or California Avenues.

The daily use of the elevated embankment and the tracks by the children, and their climbing on standing cars and riding on the side of the slow moving cars, had been going on for at least 25 years prior to the occurrence. This use of the elevation by the children was more extensive after school hours in warmer weather and throughout the day during vacations.

Salvatore Sparachio testified that he owned and operated a screw machine plant on the south side of Harrison Street, a short distance west of the tracks. He was born in that neighborhood and grew up there.

After he moved to a home elsewhere, he continued to operate his business at Harrison and Rockwell Streets. He described the physical conditions in the area. He was 35 years old, and from the time he had been about twelve years old, children had gone on the railroad elevation and tracks between Harrison and Van Buren Streets. He had been up on the tracks himself when he was a youngster, lots of times, had walked on and crossed over the tracks many times, and during the years had seen other boys do the same thing, down until June, 1959. The children were up on the elevation and tracks daily during the summer time. The children played on the tracks, got on trains as they were passing through and jumped off, having a good time. Mr. Sparachio stated that at no time prior to June 12, 1959, was there a fence erected on the east side of the railroad tracks along the north side of Van Buren Street. He had called up the Northwestern Railroad police to tell them about children on the tracks, and children jumping on and off trains.

Hugo R. Koehler, of Skokie, Illinois, retired, testified that he was a conductor for the Baltimore and Ohio Railroad for about 35 years. On trips for the Baltimore and Ohio over this stretch of tracks at Van Buren and Rockwell, he usually rode in the caboose on the northbound trip from 14th and Robey [Damen] to the St. Paul at Grand Avenue and Western between 1:00 and 1:30 in the afternoon. They would arrive there about 2:00, and would leave there about 2:30 or 3:00 in the afternoon, southbound to 14th and Robey [Damen]. These trips were on the No. 1 or most easterly track going north, and the No. 2, second from the east (Pennsylvania track), going south. He made these trips daily between the years 1956 and 1960. On the trip northbound he very seldom saw "kids" up there on the right of way, but

412

coming back in the afternoon around 3:30 or 4:00 p. m., they would see quite a number of children up there trying to get on trains. When the "kids" were getting on or off the trains, the speed would be pretty slow, around four or five miles an hour. These children would be on the right-of-way, and looking at you, and throwing stones, and sometimes there would be little tots asking for chalk. Neither he nor his men ever gave them any chalk but they sometimes did use chalk as part of their job in the railroad yards. The children would get on the side of a car or the caboose, would get on and off, and get on and get off again. They (the railroad men) would be very careful when they saw the children, would tell them to keep off the cars, and would be very careful when they told them to get off because they (the children) get scared and might jump off before getting to the bridge (the girders) and that is where they could get caught. Ordinarily, the youngsters would get off when they were told to, and naturally some youngsters wouldn't, would start to try to kid, but usually, if they (the railroad men) were close to them, the children would get off the cars.

The children rode on all kinds of foreign trains, the New York Central, the Soo Line, various railroads. This was true both on the Pennsylvania and the Northwestern trains. Koehler saw children getting on and off trains in that area for several years. If he saw children there, he would tell them to get off the right-of-way and not to flip the trains, and would try to explain how dangerous it was to get on the train because of the girders. If the children were on another train or in the middle of Koehler's train, that would scare the railroad men because they couldn't holler at the children or warn them. He reported to his own company, to the Baltimore and Ohio, that there were children on the tracks, and had no

413

doubt that he mentioned it to the yardmaster of the Chicago, Milwaukee and St. Paul Railroad at Western Avenue, told them that there were a lot of kids there. He testified at an inquest in August, 1957, at the County Morgue that he had frequently seen children playing up on the tracks in that area.

Henry Lee Edwards, the plaintiff, was born January 2, 1946, and in June, 1959, when injured, was approximately thirteen years and five months old. He was in the lower half of seventh grade, called 7–B, in Manley Elementary School. His health, eyesight and hearing were good, and he was not crippled or deformed in any way before the accident; he was of average intelligence. Before he was injured, he was a member of a regular boy scout troop, played baseball in a league and was a patrol boy.

The plaintiff had been up on the elevation at Rockwell previously, and he stated the conditions shown in the various photographs were that way as long as he had known them. He usually walked up the path on the east side of the embankment, just north of Van Buren to get to the playground. If this passage on the elevation wasn't used to get there, it required a trip of a half mile, using the crossing at Western or California Avenues. The boys going over to the playground or coming back home from it took the short cut on the railroad embankment. To Henry Edwards' knowledge, children used that elevated embankment every day before he was hurt. When up on the elevation, the children would wave at the railroad men and ask for chalk. Sometimes the railroad men would throw chalk out the window, and sometimes they said they didn't have any. At times Edwards saw children on the railroad cars while the cars were moving or standing. Children used to hop on the trains, ride about a block, and jump off. At times the trains would stop and railroad men would get on or off. The kids would climb the ladders and jump off.

414

During the four years that Henry Edwards played on the elevation and used that path to go to the playground or to go back home, a man spoke to him on one occasion about not going up there. He thought that was about a year and a half before he was injured. The man, who had seen Edwards coming through the fence at the playground, told Henry and the boy with him that they shouldn't be up there. He said nothing further, and nothing about danger. Henry stayed off the elevation for two or three days, but the other boys were still going up there, and some of them were friends of his, and he started to go up there again. He had never gotten on any railroad cars while they were standing or moving before the day of the accident.

On June 12, 1959, when he was injured, Edwards and a friend, Lopez, were on their way to the playground to play ball. The accident happened on a school day and the plaintiff attended school in the morning. There were classes in the afternoon but he did not attend; it was a hot day and he went swimming at a public swimming pool with some boys he knew. Then he went home, then went to the house of a friend, Jose Lopez, and they were on their way to the playground to play baseball. Lopez was fourteen or fifteen years old, and he was taller and bigger than Henry Edwards. They attended the same school and were in the same grade. Edwards and Lopez went up the pathway at Van Buren and Rockwell, using the pathway leading from the public sidewalk up to the stone wall at the point where a large stone was missing, just north of Van Buren Street, on the east side of the railroad tracks. When they got up on the tracks, Lopez and Edwards started towards the park and then they saw a train approaching, going north, on Pennsylvania track 1. Lopez jumped onto a ladder of one of the cars. After he saw Lopez get on, Henry Edwards also got on, and they both

415

rode the slow moving freight train about two blocks, to about Adams Street. There they jumped off and started playing around and then headed back towards the playground.

Just before he was injured, Henry Edwards got on a southbound Milwaukee Railroad freight train consisting of about ten or twelve cars. It was on Pennsylvania track 2, the second track from the east. The two boys were walking back to the playground, going south, when they heard this southbound train approaching. No bell was rung or whistle blown. The boys were just west of track 2, and when the engine got close, they stepped out of the way and stopped, facing towards the train. The train was going very slow. The window was open on the engineer's side, and he was there in the cab. They waved at him and he waved back, but there was no conversation. Lopez got on the tank car which was right in front of the caboose, at the back end of the train, and Henry followed him. There was a place (boardwalk) on the tank car where one could stand and hold on and walk around. Both boys got on that car and rode down to the girders at Van Buren Street, holding onto a (horizontal) pipe. They were standing on the west side of the car and the caboose was right behind them. It was about 5:15 p. m.

The boys were standing on the boardwalk which extends around the tank car, and when they got to the girders at Van Buren Street, the top of the girder was about one-half foot higher than the boardwalk around the tank car, and there was about six inches space between the tank car and the girder. The girders are about a foot and one-half wide, on top.

As the tank car was slowly passing alongside the girders at Van Buren Street, Lopez jumped onto the girder to the west of the train. The plaintiff followed him, somewhere about the middle of the girder, and

416

got onto the girder all right. The girder was dry. Edwards was then going to jump down to the ground on the other or west side of the girder but never got to do that. He bumped into Lopez, lost his balance, and fell down on the east side of the girder between the girder and the train. The next thing he remembers was coming to in the Illinois Research Hospital. He had suffered the complete traumatic amputation of his left leg about 4 to 5 inches below the top of the hip bone. The leg was brought to the hospital in a bushel basket. He also suffered the loss of his right leg about three inches below the knee. It was attached only by skin, about an inch wide, when Henry arrived at the hospital, and the amputation was completed there.

Emil Hessert, a witness for defendants, employed as a police lieutenant by the Pennsylvania Railroad, testified that his duties took him into the area of Rockwell and Van Buren Streets. He stated his job was to protect the property of the railroads and merchandise in the trains, but that he warns people off the property, in the majority of cases juveniles, and if the boys are "flipping trains" or stoning trains, he takes their names and addresses and takes them to their homes or the police station. He covered an area including various yards during each tour of duty, amounting to 30 to 37 miles, sometimes on foot and sometimes in his automobile. He couldn't drive alongside the railroad tracks in question from Jackson to Congress Street and therefore, when he got to Jackson, he drove west to California, a quarter-mile from the tracks, south to Congress Street, then east to a point near the tracks, where he parked and sat in his car for about one-half hour. He did not patrol the area in question from Jackson and Rockwell to Van Buren and Rockwell. He would then go to the 59th Street yard at 59th and Leavitt, a big classification

417

yard, and check on shipments of cigarettes, liquor and especially valuable merchandise. In all, each day he covered several railroad yards, many miles of track, checked many trains, and checked on the work of his subordinates at certain yards. Sometimes he gets tied up on special calls, any one of which may be for a full day, as when the seal has been broken on a car with valuable merchandise, and where some of the merchandise is missing. These special assignments take priority. Hessert testified that during the periods he was there at Congress Street, he saw children on the right of way at Van Buren Street on several occasions, and also on the right of way opposite the playground, and has seen children moving south on the railroad right of way to get from Van Buren Street to the playground, or coming back from the playground going north. That had been true all during the period that he was there.

There were "No Trespassing" signs posted in the area but they did not remain standing. Sometimes they would be there for one day, sometimes for a week before they were no longer standing.

Gerald W. Hipskind, a witness for defendants, a policeman for the Chicago and Northwestern Railroad Company, testified that he patrolled the elevation daily and that his duties took him into the area of Van Buren and Rockwell Streets; that he visited the elevation during the noon hour on June 12, 1959, and at 3:00 p. m., when children are released from school. He said he saw Henry Edwards and another boy on October 17, 1958, on the Northwestern tracks in the vicinity of the Congress Street bridge, talked to them and explained the dangers, told them how easy it was for them to lose their arms or legs by jumping on or off trains, and warned them against playing on the tracks in the future, took their names and addresses and the names of their parents and the schools they attended, "released them," and then made a report.

During the years he worked there, children of various ages, from six to sixteen years, would go up on the railroad tracks. He testified he was in the area of Rockwell Street several times a week, would park his car at Jackson, enter the elevation at Jackson Boulevard, walk south to Congress Street and back to Jackson. He said he would be there every day all during the school year, during the lunch period, and then from 3:00 to 5:00 p. m., walking back and forth on top of the railroad right of way, patrolling from Madison Street to the playground, even on poor days in the wintertime when it was snowing or sleeting or raining, all the year round. He testified that he found Edwards and another boy on the Northwestern tracks in the vicinity of Congress Street, something that a lot of kids had done for 17 years as far as he knew. He did not remember what these two boys were doing on that day, or whether they tried to run toward him or away from him, and could not remember the words he spoke to them except that he had a procedure he followed. He could not remember what he actually said to Henry Edwards on the day referred to in 1958. Edwards denied that Hipskind warned him about getting on trains. He had not been on any train.

Count II of the complaint is based upon the case of Kahn v. James Burton Co., 5 Ill2d 614, 126 NE2d 836, and charges the Pennsylvania Railroads with the negligent violation of their common law duty to use reasonable care to protect children from injury by reason of activities and conditions hazardous and dangerous to youngsters who were likely to go upon the property of the defendants. The rule in the Kahn case was stated by the Court at p 625: ". . . where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury

to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children[, then] . . . there is a duty upon the owner or person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. (Wagner v. Kepler, 411 Ill 368, 104 NE2d 231.) The element of attraction is significant only insofar as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeability of harm to the child. Whether the lumber pile was sufficiently attractive to entice children into climbing upon it, whether its condition would involve danger from such activity, and whether the contractor should have anticipated the probability of the accident, were matters for determination by the jury. City of Pekin v. McMahon, 154 Ill 141, 39 NE 484." Plaintiff contends that defendants-appellants violated this duty by reason of their failure to fence the area between the northeast Van Buren Street underpass wall and the existing fence erected by the Chicago Housing Authority paralleling the elevation.

Defendants maintain that a moving railroad train does not fall within the category of "a defective structure or dangerous agency existing upon the land" as a matter of law and that therefore the Kahn case has no application to the case at bar; and that, rather than the Kahn case, the case of Briney v. Illinois Cent. R. Co., 401 Ill 181, 81 NE2d 866, and Jones v. Schmidt, 349 Ill App 336, 110 NE2d 688, are controlling here.

The Kahn case involved a child who was playing on a pile of lumber at a building construction site; the pile toppled over and one of the heavy boards fell on the child's back fracturing his spine. Plaintiff there proceeded on the attractive nuisance theory,

but the Court refused to accept this theory as the basis for liability, because, as it stated at p 624: "The naming or labeling of a certain set of facts as being an 'attractive nuisance' case or a 'turntable' case has often led to undesirable conclusions. The inclination is then to find a stare decisis pigeonhole or category. The difficulty in such procedure is that too often the result of such a search is the reaching of irreconcilable conclusions." After noting the conflict which has resulted in the cases due to the attempt to categorize a particular set of facts, the Court concluded: "In view of the foregoing conflict and the fact that, as many courts have declared, a child in his youthful fancy, imagination and ingenuity can make a plaything of almost anything and is attracted by almost everything, the only proper basis for decision in such cases dealing with personal injuries to children are the customary rules of ordinary negligence cases."

██ The import of the Kahn case is clear. Were we to accept defendants' distinction between objects in motion and stationary objects, the net result would be to "pigeonhole a certain set of facts" and thereby defeat the purpose behind the Kahn rule. Again, the plaintiff proceeds under the Kahn rule and not, as defendants here contend, under the attractive nuisance doctrine. The Kahn case has adopted the theory of "foreseeability of harm to the child" as the true basis of liability. The element of attraction is important only insofar as it indicates that a trespass should have been anticipated by the owner or the possessor of the land and the question of whether the object involved was attractive so as to entice children upon it is a question for the jury. Under the facts of this case a jury could reasonably have found that the moving railroad train was sufficiently attractive to entice children into climbing upon it, that its con-

421

dition would involve danger from such activity, and that the defendants should have anticipated the probability of the accident. We therefore are of the opinion that an injury to a child caused by a moving railroad train can come within the scope of the Kahn rule.

Defendants rely on the cases of Briney v. Illinois Cent. R. Co., 401 Ill 181, 81 NE2d 866, and Jones v. Schmidt, 349 Ill App 336, 110 NE2d 688, as controlling here. The Briney case involved an eight-year-old child who was injured while attempting to hitch a ride on a moving train. The court held that, even though the child was on the defendant's property by consent, he exceeded the scope of his invitation by attempting to jump aboard the train and was therefore a trespasser. The case was decided seven years before the Kahn case and was not tried on the attractive nuisance theory which was then the law in Illinois but rather on the novel theory that the plaintiff was on the defendant's property to help the railroad men do their work. The court in the Kahn case noted the Briney decision, but then in effect stated that it did not apply where harm from an object on the land was foreseeable to children who were enticed upon the land by the allurement of the object. The Jones case also involved the question of invitation and trespass by exceeding the scope of the invitation and was not tried on the attractive nuisance theory. Jones was decided three years prior to the Kahn case. In neither Jones nor Briney was the question of foreseeable trespass raised as it was in the Kahn case and here. Secondly, the court in the Kahn case was not concerned with trespass as a bar to recovery in cases involving personal injuries to children where the trespass is foreseeable: "The element of attraction is significant only in so far as it indicates that the trespass should be anticipated, the true

basis of liability being the foreseeability of harm to the child." Kahn v. James Burton Co., 5 Ill2d 614, 625, 126 NE2d 836. The plaintiffs in the Briney and Jones cases, on the other hand, were denied recovery due to the element of trespass. The Kahn rule must therefore take precedence over the Briney and Jones cases where trespass by children and resulting harm are foreseeable.

Defendants further contend that the trial court erred in refusing to direct a verdict in their favor on the grounds that plaintiff's claim was barred as a matter of law for the reason that he had violated a statute which prohibits the unpermitted climbing onto a moving railroad train. (Ill Rev Stats 1961, c 114, § 72.) In support of this contention defendants rely on the case of Griffin v. Chicago & W. I. R. Co., 101 Ill App 284. The Griffin case, decided in 1902, involved a nine-year-old boy who was injured while attempting to jump onto a moving railroad train. An Illinois statute prohibited such activity. The trial court directed the jury to find for the defendant railroad and the Appellate Court affirmed the judgment, thereby holding in effect that the plaintiff's claim was barred as a matter of law by reason of his violation of the statute.

The Griffin case does not state the law of Illinois as it presently exists. "Violation of the law by the injured party at the time of the accident is usually evidence of negligence, but there remains a question of fact whether the illegal act is the proximate cause of the injury." Bonnier v. Chicago, B. & Q. R. Co., 2 Ill2d 606, 119 NE2d 254. It is only one of the facts to be considered in determining whether a party is guilty of negligence or contributory negligence. Reinert v. Willing, 13 Ill App2d 163, 141 NE 2d 399. Secondly, the question of negligence on plaintiff's part is involved here. Where the party charged

with the negligence is within the seven-year to fourteen-year age group, the presumption exists that he is incapable of negligence; this presumption can be rebutted, however, by the party's alleging the negligence showing that the child had the mental capacity to act negligently. Hughes v. Medendorp, 294 Ill App 424, 13 NE2d 1055; Levin v. Lauterbach Coal & Ice Co., 329 Ill App 180, 67 NE2d 303. All the plaintiff in such age group is required to do is show that at and just before the time of the accident he was in the exercise of that degree of care which a child of his age, experience, intelligence and mental capacity would be exercising under like or the same circumstances. Hughes v. Medendorp, 294 Ill App 424, 13 NE2d 1055. Whether the presumption has been rebutted is a question of fact for the jury, as is the question of whether the violation of the statute constituted the proximate cause of the injury.

A correlated objection raised by the defendants to the trial court's rulings is that the court erred in refusing to direct a verdict for defendants on the grounds that plaintiff was contributorily negligent by jumping on and off the moving railroad train. This objection must fail for the same reasons set out above concerning the violation of the statute. Whether the presumption that plaintiff, a thirteen-year-old child at the time of the accident, was incapable of acting negligently was rebutted by defendants' evidence as to his mental capacity, experience, age and intelligence was a question of fact for the jury. The trial court properly refused to direct a verdict for defendants on both the matter of contributory negligence and the matter of the violation of the statute.

Defendants further maintain that the trial court was in error in submitting plaintiff's Instruction Number 14 to the jury. The instruction reads as follows:

"A child is not held to the same standard of conduct as an adult. When I use the words 'ordinary care' with respect to the plaintiff, I mean that degree of care which a reasonably careful child of the age, mental capacity and experience of the plaintiff would use under circumstances similar to those shown by the evidence. The law does not say how such a child should act under those circumstances. That is for you to decide.

"The rule I have just stated also applies when a child is charged with having violated a statute.

"With respect to the charge that the plaintiff violated a statute by going upon a railroad car, you are advised that in the case of a child thirteen years old, it is presumed under the law that a child of that age does not have the mental capacity to violate the law, and the party relying upon the claimed violation of the statute by the child has the burden of overcoming that presumption by proving that the child did have such capacity at the time."

Defendants contend that paragraph three of the instruction imposed the burden on the defendants to show that the plaintiff had the mental capacity to violate the statute, whereas this may be the rule for criminal behavior but not for a civil violation; they rely upon Griffin v. Chicago & W. I. R. Co., 101 Ill App 284, in support of this position.

 Paragraph three of the instruction correctly states the law of Illinois as it presently exists. A child under fourteen years of age is presumed incapable of violating a penal statute. Angelo v. People, 96 Ill 209; People v. Lang, 402 Ill 170, 83 NE2d 688. This presumption is not conclusive, however, and may be rebutted by a showing that the child did in fact have the mental capacity to violate the law. People v. Lang, 402 Ill 170, 83 NE2d 688. Defendants set up the claimed

violation of the statute as an affirmative defense, thereby taking upon themselves the burden of proving the violation in fact occurred. Without their showing that the plaintiff had the mental capacity to violate the statute, which is one of the elements in the affirmative defense, no violation in fact could have been proven against plaintiff. Defendant's assertion that the presumption of incapacity under fourteen years of age does not apply to "civil violations" can be answered simply by saying that the violation of a statute is merely presumptive evidence of negligence, Smith v. Ohio Oil Co., 10 Ill App2d 67, 134 NE2d 526, and that where negligence is involved the burden is still on the party alleging the negligence to rebut the presumption that a child under fourteen is incapable of negligence. If the violation is equated to negligence, then it is still incumbent upon the party alleging the violation to rebut the presumption that the child is incapable of negligence. The instruction properly stated the law.

▮▮ Finally, three forms of verdict were submitted to the jury: (1) for plaintiff and against all the defendants; (2) for plaintiff and against only the Pennsylvania Railroads; and (3) against plaintiff and for all defendants. Defendants-appellants suggest that the trial court was in error in refusing to submit the following fourth form of verdict to the jury:

> "We, the jury, find against the defendant, Chicago, Milwaukee, St. Paul & Pacific Railroad Company, a corporation, and assess the plaintiff's damages in the sum of $———.
> "We, the jury, find in favor of the defendants, The Pennsylvania Railroad Company, a corporation, and The Philadelphia, Baltimore & Washington Railroad Company, a corporation,

and against the plaintiff as to the said defendants."

It is true, as defendants point out, that this form of verdict does follow IPI 45.03 for use with a single plaintiff and multiple defendants. However, under the state of the law in Illinois relating to negligence by a lessee railroad, the submission of this form of verdict to the jury would clearly have been erroneous. It has long been settled in Illinois that the lessor railroad is vicariously liable to a person injured through the negligence of the lessee railroad, even though there had been no fault on the lessor railroad's part. Chicago & E. I. R. Co. v. Schmitz, 211 Ill 446, 71 NE 1050; Armstrong v. C. & W. I. R. Co., 350 Ill 426, 183 NE 478. If the jury found that the Milwaukee Railroad was liable for damages due to its negligence, then it was bound under the law to find that the Pennsylvania Railroads were also liable; under no circumstances could the jury have found the Milwaukee Railroad liable for damages and the Pennsylvania Railroads not liable. The three forms of verdict submitted to the jury therefore represented the only possible results to which the jury could come.

The ordinance relied upon by appellee under Count I of the complaint was the City of Chicago special contract ordinance of January 18, 1897, as accepted by the Pennsylvania Railroad through its various subsidiaries on February 5, 1897. The ordinance in substance required the accepting railroads to elevate certain portions of their track, to construct underpasses at various cross streets, and to either build retaining walls for the elevations or enclose them with fences in accordance with the City of Chicago fencing ordinance of 1890.

427

In two cases decided in 1925, the Supreme Court of Illinois held that the passage of the Public Utilities Acts of 1914 and 1921 rendered invalid all municipal enactments and ordinances, both general and special, which related to public utilities. Village of Atwood v. Cincinnati, I. & W. R. Co., 316 Ill 425, 147 NE 449; Northern Trust Co. v. Chicago Rys. Co., 318 Ill 402, 149 NE 422. In the Northern Trust case, the Court held that a City of Chicago general ordinance requiring headlights on streetcars was rendered invalid by passage of the Acts, and that a person who was fatally injured when struck by a streetcar due to an improperly functioning headlight was precluded from relying upon the ordinance for recovery. The Court stated at page 412: "If it had been deemed wise or necessary, municipal ordinances and police regulations relating to public utilities could have been continued in force until the commission acted, by a saving provision in the act or by an order to that effect from the commission itself. But the act contains no such provision, nor does it appear that the commission made, or was asked to make, any such order."

Shortly after the decisions in the above two cases, the Illinois Commerce Commission adopted General Order 121, which is entitled: "In the matter of practices and operations by public utilities relating to the health, comfort or safety of their employees and of the people in cities, villages and incorporated towns in the State of Illinois." This order states, in substance, that the decisions by the Supreme Court in the above two cases indicate that the passage of the Public Utilities Acts of 1914 and 1921 repealed by implication certain police powers conferred upon municipalities by the Cities and Villages Act, and that these police regulations were now inoperative and without authority of law; that these municipal en-

actments may be in the form of general ordinances or specific provisions in contracts or licenses, franchises, or other forms of regulatory provisions; that difficulty and delay would necessarily attend a comprehensive survey of all such enactments and that the public would be without protection during the period of investigation. The order further stated that it appeared some immediate and comprehensive action should be taken by the Commission continuing the police regulations in the form of city ordinances or regulations. The Commission ordered that all practices and operations of every public utility in compliance with any ordinance or regulation of any city, village or town providing for the protection of the health, comfort or safety of the employees of the utility or of the people of the state, be established, continued and maintained until further order of the Commission.

On July 29, 1937, after some two and one-half years of hearings and investigations, the Commission adopted General Order 138, which is entitled: "In the matter of Rules, Regulations and Requirements relating to the construction, maintenance, marking and protection of crossings of Highways and Railroads in the State of Illinois." The order is captioned: "In the matter of proposed revision and consolidation of rules and regulations and requirements of the Commission relating to the construction, maintenance, marking and protection of crossings of highways and railroads in the State of Illinois, as now set forth in General Orders 4, 33, 36, 40, 50, 55, 106, 119, 120 and 123." The order states in substance that the Commission adopted a resolution whereby proceedings were instituted for the revision and consolidation of its rules, regulations and requirements relating to the construction, maintenance, marking and protection of crossings of highways and rail-

roads, that hearings were held and evidence was taken on various dates between January 16, 1935 and June 9, 1937, which evidence included a copy of the proposed General Order 138, and that the Commission, having considered all of the evidence, is of the opinion that the proposed General Order 138 sets forth reasonable, just and proper rules, regulations and requirements relating to the construction, maintenance, marking and protection of crossings of highways and railroads in the State of Illinois, and that the adoption of the said General Order 138 will result in the Commission's requirements on this subject being assembled in a single document, and being brought up to date and in harmony with present conditions, and will promote the safety and convenience of the public and of the railroads in this State; that all of the General Orders enumerated in the caption of General Order 138, except General Order 4, should be rescinded; and that General Order 121, to the extent that it applies to railroads, should be superseded and rescinded by General Order 138, but otherwise to remain in effect. The Commission ordered that General Order 138 is adopted and declared to be the rules and regulations and requirements of the Commission relating to the construction, maintenance, marking and protection of crossings of highways and railroads in the State of Illinois, that General Orders 33, 36, 40, 50, 55, 106, 119, 120 and 123 are rescinded, and that General Order 121, to the extent that it applies to railroads, is superseded and rescinded by General Order 138, but otherwise to remain in effect.

Appellants take the position that General Order 138 completely nullified General Order 121 as it applied to railroads, which in turn removed any duty on their part to fence the area between the Van Buren Street underpass wall and the existing fence which ran parallel to the elevation; that appellee is

therefore precluded from relying on the special ordinance in question as a ground for liability; and that the trial court was in error in allowing the ordinance into evidence and in allowing it to serve as the basis of an instruction to the jury. Appellee contends that, although the ordinance may have been rendered invalid by the passage of the Public Utilities Acts, the requirements of the ordinance were continued in force and effect by General Order 121; that General Order 138, while it may have rescinded the grade crossing requirements reinstated by General Order 121, had no effect on the fencing requirements reinstated by that order; and that the statutory duty still remained with appellants to fence the area in question.

We are of the opinion that the fencing requirements of the City of Chicago special ordinance of January 18, 1897, were in force and effect at the time of appellee's injury; that appellants had the duty to fence the area in question; and that the trial court properly admitted the ordinance into evidence and allowed it to serve as the basis of an instruction to the jury.

Sec 67 of the Public Utilities Act (Ill Rev Stats 1963, c 111⅔, § 71) which was in effect at the time of the adoption of General Order 138, requires that the Illinois Commerce Commission give notice of the subject matter to all interested parties and afford them an opportunity to be heard before it can alter or rescind any prior order. Furthermore, the Commission's authority to act under section 67 is controlled by section 65 of the Act (presently section 69) in that any such rescinding or modifying order must be based upon findings of fact which in turn must be based upon the evidence presented. Farmers' Elevator Co. of Yorkville v. Chicago, R. I. & P. Ry. Co., 266 Ill 567, 107 NE 841; Central Northwest Business Men's Ass'n v. Commerce Commission, 337

Ill 149, 168 NE 890. The Commission is without power to change existing regulations arbitrarily or through caprice. If the statutory requirements are not followed as to notice or hearing or presentation of evidence and finding of fact based thereon, the Commission loses its jurisdiction to act and any order entered by the Commission under such circumstances is necessarily void. Chicago Dist. Pipeline Co. v. Commerce Commission, 361 Ill 296, 197 NE 873; Dietman v. Hunter, 5 Ill2d 486, 126 NE2d 22; 2 Am Jur2d Administrative Law §§ 398, 400.

Examination of General Order 138 shows that the notice of the hearings and the hearings themselves, upon which the order was based, were limited to the "general revision and consolidation of rules and regulations and requirements of the Commission relating to the construction, maintenance, marking and protection of crossings of highways and railroads in the State of Illinois, as now set forth in General Orders 4, 33, 36, 40, 50, 55, 106, 119, 120 and 123." No reference was made to General Order 121 at this point. It is also significant to note that all of the aforementioned orders, except General Order 121, dealt specifically with some phase of highway and railroad crossing marking, maintenance, protection and construction. The entire body of General Order 138, including the forms and drawings relating thereto, shows that the inquiry was precisely limited to the subject of marking, maintenance, construction and protection of crossings of railroads and highways, and indicates that evidence was taken on that subject alone. The findings are limited to the subject of marking, maintenance, protection and construction of crossings of highways and railroads and in no way indicate that the subject matter of fencing is involved. Finally, nowhere in the entire document is there a word pertaining to the subject matter of fencing.

■ Appellants suggest that the finding and order of the Commission, that "General Order 121, to the extent that it applies to railroads, should be deemed to be superseded and rescinded by General Order 138, but otherwise to remain in effect," were intended simply to remove any and all railroad ordinance requirements from the purview of General Order 121 to the jurisdiction of General Order 138. But the wording of the finding and the order in question is susceptible to two different interpretations, namely, that the Commission found and ordered that all railroad ordinance requirements covered by General Order 121, including fencing, should be rescinded and superseded by General Order 138, or, that the Commission found and ordered that General Order 138 rescinded and superseded General Order 121 as it applied to railroads but only insofar as General Order 138 was capable of so doing. Where such ambiguity exists in an administrative order the rule of construction applicable to statutes and to judgments and decrees of court should be applied. See 50 Am Jur Statutes §§ 225, 226; 2 Am Jur2d Administrative Law § 307; Aloe v. Lowe, 298 Ill 404, 408, 131 NE 612.

■ ■ The Commission knew the extent of the notice given, of the hearings and investigations, and of the findings of fact made for the purpose of effecting General Order 138. Its stated purpose in adopting General Order 138 was to unify into a single document and to bring up to date its requirements on the subject of construction, maintenance, marking and protection of crossings of highways and railroads. Not one shred of evidence exists that the Commission was concerned with matters other than crossings of highways and railroads. Another of its stated purposes in the adoption of General Order 138 was the protection and convenience of the public and the railroads operating in the State of Illinois; the Com-

mission's purpose in adopting General Order 121 was the reinstatement of the protection afforded by municipal enactments affected by the passage of the Public Utilities Acts during the period while the Commission was engaged in a comprehensive survey of all such enactments. Appellant's construction of that part of General Order 138 here in question, however, would frustrate the Commission's intention to afford protection to the public, by eliminating these protections in all phases of railroad activity other than the construction, maintenance, marking and protection of crossings. To attribute to the Commission the intention of rescinding any and all railroad ordinance requirements covered by General Order 121 is therefore unreasonable. This is especially true in view of the fact that such a construction of the order would render the entire order void for lack of proper notice, hearings, and findings of fact as to all railroad ordinance requirements covered by General Order 121 other than those relating to the maintenance, marking, protection and construction of crossings. It is evident that the effect of General Order 138 upon General Order 121 was intended by the Commission to be limited solely to the scope of General Order 138, namely, the recision of all railroad ordinance requirements covered by General Order 121 relating to marking, maintenance, construction and protection of crossings and in no way was intended to affect the fencing requirements.

The question of collateral attack on a Commerce Commission order raised by appellants is moot; under the construction given to General Order 138, a consideration of the validity of the order is unnecessary. Secondly, applying the rule applicable to judgments and decrees of court, the construction of an order does not involve an attack upon its validity. See 30A Am Jur Judgments § 69; St. Louis, K. C.

& C. R. Co. v. Wabash R. Co. and City of St. Louis, 217 US 247; Ballew v. Denny, 296 Ky 368.

Similarly, the review provisions of the Public Utilities Act have no application here. This court is not attempting to put itself into the place of the Commerce Commission; it is not attempting to try a second time a question already presented to the Commission; nor is it attempting to substitute its own judgment for that of the Commission. Construction of ambiguous wording in an administrative order and a reconsideration of the merits of the order are two entirely different matters.

We find no conflict between the views presented here and those presented by the United States Court of Appeals for the Seventh Circuit in the recent case of Blaauw v. Grand Trunk Western Railroad Company, 333 F2d 540. John Blaauw, a five-year-old boy, was injured by defendant's railroad train. He and two companions were on defendant's right-of-way, having gained access thereto by an unfenced culvert which was frequently used by the neighborhood children to get to a small pond of water on the right of way. Blaauw crawled between two railroad cars and after he got to the other side the train began to move. He took hold of a grab-bar on the car, ran with the train a short distance, tripped and fell under the wheels. Plaintiff maintained at trial that (1) defendant had violated its common law duty to fence the area and to take necessary precautions under the circumstances in accordance with the Kahn rule and (2) defendant had violated the duty to fence imposed by an 1890 Chicago ordinance as continued in force and effect by General Order 121 of the Illinois Commerce Commission; and that this was the proximate cause of his injury. The trial court directed a verdict for defendant on the ordinance count, relying on General Order 138 as the basis therefor, and

435

the jury found for the defendant on the common law count. Plaintiff appealed, alleging (1) that the verdict was against the manifest weight of the evidence and (2) that the trial court erred in directing a verdict for the defendant on the ordinance count for the reason that General Order 138 was ineffective due to procedural errors on the Commission's part in adopting the order. The Court of Appeals affirmed, holding that the questions of negligence, proximate cause and damages were jury questions and that the reviewing court will not interfere unless it is clearly evident that the verdict is against the manifest weight of the evidence; that the jury could reasonably have found that the defendant's conduct was not the proximate cause of the injury; and that plaintiff had relied on the procedural errors involved in the adoption of General Order 138, thereby challenging a voidable order only incapable of collateral attack. In the case at bar, however, appellants do not raise the question of sufficiency of evidence, but rely solely on other questions of law for reversal. Secondly, the plaintiff in this case requested a construction of General Order 138 as the preferred alternative to questioning its validity, which was not requested in the Blaauw case.

For these reasons the judgment is affirmed.

Judgment affirmed.

FRIEND and BRYANT, JJ., concur.