JOHN ENGEL, a Minor by his Mother and Next Friend, Donna Hultman, Plaintiff-Appellee and Cross-Appellant, v. CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY, Defendant (The Chicago Park District, Defendant-Appellant and Cross-Appellee).

First District (4th Division) No. 1—88—0074

Opinion filed February 16, 1989.—Rehearing denied August 24, 1989.

Kralovec, Marquard, Doyle & Gibbons, Chartered, of Chicago (Nancy Jo Arnold and Baker & McKenzie, of counsel), for appellant.

Hofeld & Schaffner, of Chicago (Albert F. Hofeld and Howard Schaffner, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

The minor plaintiff, John Engel, was severely injured when he jumped from a moving train. Following a jury trial, he was awarded $5 million in compensatory damages and $1.5 million in punitive damages. The trial court subsequently vacated the punitive damages award, on post-trial motion, but upheld the jury's verdict as to liabil-

ity and compensatory damages. Defendant Chicago Park District (District) appeals, contending that the risk of danger in climbing on and off a moving train is obvious and that defendant therefore had no legal duty to plaintiff. The Park District further argues that it did not receive a fair trial because the jury was angry and prejudiced against it, as indicated by the large award and the finding that Engel had zero contributory negligence for his injuries. Plaintiff cross-appeals from the trial court's entry of judgment notwithstanding the verdict on the punitive damages award.

We affirm.

BACKGROUND

John Engel was 12 years old on September 27, 1981. On that date he went to Hermosa Park in Chicago to play with his friends. The park is operated by the Chicago Park District. There are tennis courts, a playground, a playing field, and other recreational facilities. The entire park is fenced. Along the west side of the park are railroad tracks.

For at least two years prior to Engel's injury the fence along the west side had a large opening that extended from the bottom to the top of the fence. Children and adults used this large hole in the fence as a short cut. Through this opening, children had direct access to the railroad tracks from the park. There was an embankment leading to the tracks, and railroad ties set in the embankment created a stairway up to the tracks.

The Park District failed to repair this large opening in the fence, despite its admitted knowledge of its existence and dangerous condition. Internal memoranda produced at trial established that the Park District considered the unrepaired fence as a safety hazard and that its personnel knew that children used the opening to gain access to the tracks. Work orders to repair the fence were produced, but for unexplained reasons, the opening was not repaired. At trial, one of the Park District's witnesses claimed that repairs had been made, but no substantiation of that claim was produced, and, in fact, the opposite conclusion was proved by other testimony and evidence.

Testimony at trial also established that the practice of going up to the tracks through the opening in the fence was so prevalent at Hermosa Park that Park District employees frequently engaged in this conduct in plain view of the children in the park. In addition, park employees were aware that children took rides on passing trains. The practice of grabbing a short ride on slow-moving freight trains is called "flipping" the trains.

The engineer for the Park District testified that the open fence separating the park from the tracks created a "very dangerous" condition, one that would undoubtedly allow a child to get hurt if the condition existed for a long enough period of time. The District's safety director also agreed that the condition presented a very dangerous situation.

One of the Park District's employees testified that he had heard of children flipping the trains at Hermosa Park and may have actually seen this happen, but did not recall warning the children not to do this. Another witness, a child who frequently went to the park, testified that for years prior to the accident he had gone through the opening in the fence and boarded moving trains, as had others. A railroad employee testified that he had seen children trying to jump on and off almost every train that passed Hermosa Park.

Railroad employees also jumped on and off moving trains, as part of their job, and the children in the park observed this practice. The railroad would at times run brake tests at the park by stopping the trains and then restarting them while some employees were off the train. Once the railroad crew members who were off the train were satisfied that the trains were running properly, they would mount the moving train by jumping on either the side ladder or stairs of the moving railroad trains. Engel testified that he had observed the railroad crew do this without incident seven or eight times prior to his accident.

The Park District's repair department had received work orders on eight occasions to fix the fence but these orders had never been approved and the work was never done. The orders started in March of 1980, and the last one was dated in August 1981, just six weeks before Engel's leg was crushed beneath a train.

At trial the Park District attempted to show that the fence had been repaired. Testimony on that point was severely impeached, however, and there was substantial evidence to the contrary. Moreover, two sets of documents offered by the Park District appeared to be falsified. The first group of documents purported to be memos from the director of safety regarding repair of the fence. The director of safety whose name appeared on the memos, however, did not even work for the Park District at the time he allegedly wrote the memos.

The second group of documents were inspection reports prepared by Frank Barton, a safety inspector employed by the Park District. According to his testimony, he customarily prepared inspection reports on the day of the inspection, using a yellow legal pad. At the end of the day he tore the report off the pad and placed it in a file in

the office. Each new report would be prepared outside of the office and then put in the file.

The six original Barton reports, which had not been produced prior to trial, appeared to have been prepared with the same pen, on the same pad, despite the fact that they supposedly had been prepared on different dates over a two-year period. The reports were examined by a documents examiner who noted that each sheet of paper contained impressions of writing as if from another sheet of paper that was on top. Using a special technique geared to raising legible copy from the impressions on the paper, the examiner deduced that the Barton report dated September 12, 1979, for example, had been written on top of the July 12, 1979, report because of the imprint left on the July 12 report. Yet according to its date, the September 12 report would not have been in existence on July 12. The other five original Barton reports contained similar imprints.

On the day that Engel was injured he had met some friends at the park. They decided to go to a nearby store for candy. From inside the park, the shortest route to the store was through the opening in the fence and over the railroad tracks. Engel noticed a train coming at a very slow speed. The train came to a stop and Engel waved to the conductor, who waved back. When the train started up again, Engel got on a ladder on the side of the train. At the time the speed of the train was four or five miles an hour. The speed limit in that area was 10 miles an hour.

Engel rode the train for approximately 30 feet and then alighted to join his friends. He had seen others getting on and off the moving trains, including the railroad employees. He attempted to mimic the way in which the men had jumped off the train. Instead, he got spun around and fell, his left leg going under the train. The first wheel crushed his leg and caused it to stick to the track. Twenty-five cars then ran over his leg while he was helpless to move it.

After Engel's leg was surgically amputated in the hospital, the stump beat against the bed in uncontrollable spasms. He underwent repeated and painful skin grafts. He also underwent a lengthy and painful struggle to regain even limited use of his leg. The medical evidence indicates that he is in chronic pain and can walk only short distances on an artificial leg.

The jury returned a verdict in his favor, awarding him $5 million in compensatory damages and $1.5 million in punitive damages on the wilful and wanton misconduct count. The trial judge later vacated the punitive damages award on the ground that municipal corporations are immune from punitive damages awards.

Opinion

I

The Park District strenuously challenges its liability to Engel and argues that, as a matter of law, it owed him no duty to protect him from the obvious danger of climbing on the moving train. That being the case, Engel failed to state a cause of action and the matter should not have gone to the jury.

The Park District cites an impressive body of cases in which landowners were held to owe no duty to protect children from a variety of conditions on the basis of obvious danger. (*E.g.*, *Batzek v. Betz* (1988), 165 Ill. App. 3d 399, 519 N.E.2d 87 (no duty to protect 14-year-old from obvious risks of falling out of tree); *Christon v. Kankakee Valley Boat Club* (1987), 152 Ill. App. 3d 202, 504 N.E.2d 263 (no duty to fence park to keep nine-year-old away from flooded dock area); *Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 502 N.E.2d 846 (no duty to protect four-year-old from a burning candle because danger of fire is one that should be understood by a child old enough to be allowed at large).) The Park District argues that since the dangers of hopping freight trains is obvious, an objective determination, judgment should have been entered in its favor as a matter of law.

Engel, on the other hand, distinguishes the instant case from those that may be categorized as representing universal life experiences that all children have at an early age. Hence, the policy determination that children are presumed to know the risks of falling from heights, drowning, or being burned is justified. (See Restatement (Second) of Torts §339, comment *j*, at 203 (1966); *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 326, 383 N.E.2d 177.) In contrast, other risks of injury should not be presumed to be in the knowledge or life experience of all children and should be individually assessed as questions of fact. In the pending case, Engel could not be presumed to have realized the dangers of flipping the train because he had seen others, including employees of the railroad, successfully mount and dismount the slow-moving trains. Therefore, it was for the jury to determine whether his injuries were proximately caused by the Park District's breach of duty to him.

■ The Park District relies on several Illinois Supreme Court decisions to bolster its argument that it had no duty to Engel. In *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836, the court rejected the implication in the "attractive nuisance" doctrine that predicated liability on whether a dangerous condition had "lured" children onto the premises. Instead, the court found the cornerstone

of liability to be foreseeability of harm to children. In *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 326, 383 N.E.2d 177, 180, the court reiterated the *Kahn* reasoning and noted that "a duty which would not be imposed in ordinary negligence will be imposed upon the owner or occupier of land only if such person knows or should know that children frequent the premises *and* if the cause of the child's injury was a *dangerous* condition on the premises." (Emphasis in original.) A dangerous condition was defined as one likely to cause injury to children because of their inability to appreciate the attendant risks, due to age and immaturity. The existence of such dangerous condition, plus the defendant's knowledge of it, constitutes foreseeability. *Corcoran*, 73 Ill. 2d at 326.

In *Cope v. Doe* (1984), 102 Ill. 2d 278, 464 N.E.2d 1023, the court explained that this rule does not impose a *per se* duty upon landowners to remedy all conditions on the land and "if the condition complained of presents *obvious* risks which children would be expected to appreciate and avoid, there is no duty to remedy that condition." (Emphasis in original.) (102 Ill. 2d at 286, 464 N.E.2d at 1027.) The court went on to state the rationale for the rule, that since children are expected to avoid obvious dangers, there is no reasonably foreseeable risk of harm. Therefore, if a danger is "obvious" it is not considered "foreseeable." *Cope v. Doe*, 102 Ill. 2d at 286, 464 N.E.2d at 1027.

In the pending case there is no doubt from its admissions that the Park District knew that children frequented the area around the tracks and that the unfenced access from the park to the tracks presented a dangerous condition in the mind of safety engineers and inspectors for the district. The only remaining question on the issue of duty is whether the risks of flipping trains were "obvious" to the 12-year-old plaintiff, *as a matter of law.*

In *La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 478 N.E.2d 417, the nine-year-old plaintiff was severely injured after he hopped on a slow-moving freight train. The court affirmed a jury verdict in his favor despite the defendant city's assertion that plaintiff should have known that hopping a moving train was dangerous as a matter of law. The city owned land adjacent to the railroad tracks and had built and maintained a fence thereon. Children gained access to the tracks through a large hole in it, a situation of which the city had knowledge. Following *Kahn*, the court found that the elements of liability had been satisfied. The city owed a duty, which it had breached, and the fact that the plaintiff was found to be 18% at fault for his injury did not establish a specific appreciation of

risk in jumping moving trains. We find this case persuasive, notwithstanding the Park District's suggestion that it was incorrectly decided.

Further support for Engel's position is found in several other cases involving railroad injuries.

In *American National Bank & Trust Co. v. Pennsylvania R.R. Co.* (1964), 52 Ill. App. 2d 406, 202 N.E.2d 79, *aff'd* (1966), 35 Ill. 2d 145, 219 N.E.2d 529, a 13-year-old boy climbed a slow-moving train on his way to a playground which abutted the tracks. As in the instant case, children often cut through the park to the tracks. The boy sustained a traumatic amputation of his leg as he alighted from the train and fell beneath it. Both the appellate and supreme courts affirmed the jury's verdict for the plaintiff, albeit on different theories of liability. The supreme court based its affirmance on defendant's negligent operation of the train, but specifically commented that the question of the boy's contributory negligence was properly left to the jury, who was to evaluate the age, capacity, intelligence, and experience of the child. 35 Ill. 2d at 153, 219 N.E.2d at 533.

In *Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1969), 42 Ill. 2d 103, 245 N.E.2d 762, evidence established that children customarily "flipped" rides on the slow-moving freight trains and that the railroad that owned and maintained the premises knew of this fact. In affirming the jury's verdict in favor of the 14-year-old plaintiff, the supreme court held that the issue of a child's contributory negligence when climbing a slowly moving train is a question of *fact.* By necessary implication, the verdict for the plaintiff meant that he did not truly appreciate the risk of injury. See also *Pellegrini v. Chicago, Rock Island & Pacific R.R. Co.* (1980), 91 Ill. App. 3d 1091, 415 N.E.2d 615 (appellate court reversed the trial court's entry of summary judgment on behalf of the defendants, holding that jury should have decided whether 13-year-old boy who was injured after attempting to board a slow-moving train was contributorily negligent); but *cf. LeBeau v. The Pittsburg, C., C. & St. L. Ry. Co.* (1897), 69 Ill. App. 557, 560 (finding that jumping from a moving freight train is dangerous and that all men and ordinarily intelligent 10-year-old boys know it to be so).

■ We find a sufficient basis in Illinois law to uphold the submission of the instant case to the jury. Moreover, we disagree with the Park District's contention that the above-cited train-flipping cases are either distinguishable or inapposite. Although the Park District labels the train-flipping "line of cases" as an exception to the general principles of landowner liability, we do not agree. The main reason the case

cannot be determined as a matter of law is that the "obviousness" of the danger is not such that no minds could reasonably differ. The policy determination that most children are presumed to know the risks of injury inherent in certain types of activities, such as playing with fire or playing in bodies of water, does not *per se* extend to the train-flipping cases. Under different facts than are present in this case, however, a judge could find that the danger was obvious to a plaintiff or that the landowner was unaware of the condition and find no duty existed as a matter of law.

The duty in this case was repairing the fence to prevent access to the trains from the park. The Park District admitted its awareness of the children's use of the hole in the fence to go up to the tracks and its belief that the situation was dangerous. We find that the evidence amply supports the jury's conclusion that the Park District breached its duty to repair the fence and that Engel's injuries were proximately caused by that breach. Accordingly, we affirm the jury's verdict and award of compensatory damages.

## II

Next, the Park District urges us to reverse and remand this case for a new trial on the grounds that the jury was prejudiced against it. In support of this contention it primarily relies on the size of the damages award and the fact that the jury did not find Engel comparatively negligent.

■ The Park District maintains that the jury's refusal to hold Engel responsible for *any* percentage of negligence is against the manifest weight of the evidence. The Park District cites Engel's good to average grades in school and his having been near or on the trains many times as indicative of his ability to appreciate the risks involved in flipping trains. For supporting authority the District cites cases from other jurisdictions that ruled on the dangers of trains as posing obvious risks, as a matter of law. Since we have already rejected the argument that the danger in this case was "obvious," under the analysis of duty, these cases do not aid us on the manifest weight of evidence issue. Moreover, we find that the jury was the proper entity to assess all of the evidence, including Engel's age, intelligence, and experience. Since in his experience many children and adults had hopped the trains without injury, the jury could have concluded he had no true appreciation of the risks involved. We will not reweigh the evidence or substitute our judgment for that of the jurors.

■ For similar reasons we will not vacate the damages award. While $5 million is indeed a substantial sum, the Park District does

not claim that there is nothing in the record to support it. Nor does the Park District suggest what sum it believes would be reasonable compensation for Engel's medical expenses, loss of future income, pain and suffering, and disability and disfigurement. Instead, the Park District claims that the award was out of line with other comparable cases and that it was "fueled" by the jury's anger toward the Park District.

■ Ironically, the anger that the Park District now argues deprived it of a fair trial grew out of its presentation of apparently fabricated documents and untrue testimony as to the repairs made to the fence in Hermosa Park. If the jury believed that it had been lied to, and the record supports this possibility, it is hardly surprising that the jurors may have become angry. While a defendant's possible perjury at trial does not translate into a proper basis for a jury's award of compensatory damages to a plaintiff, it does suggest that the cause of the jury's "inflamed passions" was *not* plaintiff's doing, but defendant's. In any event, because the punitive damages count was also submitted to the jury, they were given an outlet to "punish" the Park District.[1] The compensatory award, therefore, stands on its own. See *Stein v. Burns International Security Services, Inc.* (1981), 102 Ill. App. 3d 776, 430 N.E.2d 334.

## III

As its final argument, the Park District challenges what it characterizes as "surprise expert testimony," incomplete impeachment of one of its witnesses, and erroneous instructions.

Mr. Hayes, a forensic document examiner, was retained by plaintiff's counsel after counsel began to suspect that the original Park District memos prepared by Frank Barton had been prepared all at one time, on one pad, with the same pen, even though they bore dates spanning two years. All experts had been barred pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220), since none had been disclosed before trial. Nevertheless, plaintiff's attorney successfully argued that he had never received the original, suspicious documents, nor had he been allowed to examine them until trial, despite discovery

---

[1] As the Park District points out, there is a distinction between punishment for wilful and wanton acts or omissions in relation to the tort itself and punishment for perjury during trial. The former is a proper base for imposition of punitive damages by a jury, while perjury may be separately punished by contempt or a criminal proceeding. (*Amerco Field Office v. Onoforio* (1974), 22 Ill. App. 3d 989, 317 N.E.2d 596.) Since the punitive damages award has been vacated, however, we need not determine whether it would have been a proper award on any basis.

requests. Therefore, he did not know he would need a document examiner until he saw the originals at trial.

■ The Park District contends that it was unfairly surprised by this witness's testimony.

We cannot agree. The court considered both parties' arguments and decided that Hayes could testify subject to limitations that would keep him from giving an expert opinion. The Park District was given the opportunity to depose him before his testimony. Under these circumstances, the trial court did not abuse its discretion. See generally *Sherman v. City of Springfield* (1969), 111 Ill. App. 2d 391, 250 N.E.2d 537.

■ Finally, we have reviewed the challenged instructions and do not find error of sufficient magnitude to reverse this cause for a new trial. Most of the challenged instructions, we believe, were proper and correct. The punitive damages instructions should not have been given, for reasons discussed below, but any error resulting was harmless. On the whole, we find that the instructions in this case accurately instructed the jury on the law.

We conclude that the trial court's entry of judgment on the jury's verdict in favor of Engel should be affirmed as to liability and compensatory damages.

## IV

On Engel's cross-appeal, he argues that the trial court improperly set aside the jury's award of $1.5 million dollars in punitive damages. Although he makes a complex argument based on the Park District's supposed waiver of immunity through purchase of insurance, we need not discuss it in detail because we find, as a matter of law, that the Park District as a municipal corporation is immune from punitive damages awards and has not waived such immunity.

■ At common law, municipal corporations have long been held immune from punitive damages awards on the ground that it would be the taxpayers who pay the penalty, not the entity itself; therefore, the objective of punishment and deterrence would be obviated. See *George v. Chicago Transit Authority* (1978), 58 Ill. App. 3d 692, 694-95, 374 N.E.2d 679, 680-81.

Under the provisions of the Local Governmental and Governmental Employees Tort Immunity Act (Act) in effect at the time of Engel's injury, "a local public entity [was] not liable to pay punitive or exemplary damages in any action brought directly against it by the injured party." (Ill. Rev. Stat. 1981, ch. 85, par. 2—102.) The Act further provided, however, that when a public entity purchased liability

insurance covering a liability for which the Act had created a defense, the insurance company could not assert the public entity's immunity or other defenses as a means of avoiding payment under its policy. (Ill. Rev. Stat. 1981, ch. 85, par. 9—103(c).) The Act has since been amended in several key respects. See Ill. Rev. Stat. 1987, ch. 85, pars. 2—102, 9—103(c).

According to Engel, punitive damages liability will lie against a municipal corporation "if the defendant is insured for that risk," citing *Holda v. County of Kane* (1980), 88 Ill. App. 3d 522, 410 N.E.2d 552, and *Collins v. School District No. 189* (1983), 115 Ill. App. 3d 100, 450 N.E.2d 387. Thus, any immunities under the Act are waived if the municipality is insured for the specific risk under consideration. The reason Engel gives is that while a municipality should benefit from the immunities given in the Act, an insurance company should not.

We note that the Act has been amended so as to allow insurance companies to use the same immunities as the municipalities they insure. (Ill. Rev. Stat. 1987, ch. 85, par. 9—103(c).) Under current law, Engel's theory would fail. Even under the law as it existed at the time of Engel's action, however, we cannot agree with his argument. The Park District itself had immunity from the claim under the Act. Its general liability insurance policy admittedly does not include or explicitly exclude punitive damages. Unless we construe the absence of an exclusion for punitive damages in the policy as a positive statement of coverage for punitive damages, the immunity has not been waived.

We find no waiver of the immunity has occurred. In the cases Engel cites, such as *Holda* and *Collins*, the courts did not state that the mere purchases of insurance waived the immunity. At best, they state that the immunity is not waived unless the insurance policy covers the *specific* risk under consideration. In this case that is the specific risk of a punitive damages award. General liability coverage as defined in the policy is not enough.

■■■ The trial court apparently believed that the policy could be construed as insuring against punitive damages. However, it dismissed the punitive damages count on the public policy ground that one cannot insure himself against punitive damages because he may not be allowed to escape economic punishment for his wrongful acts. (*Beaver v. Country Mutual Insurance Co.* (1981), 95 Ill. App. 3d 1122, 420 N.E.2d 1058.) Engel argues that a corporation may insure itself against damages, however, if its liability is truly vicarious and not the result of its own corporate acts. See *Scott v. Instant Parking, Inc.*

(1969), 105 Ill. App. 2d 133, 245 N.E.2d 124 (employer may insure himself against vicarious liability for punitive damages incurred as a result of employee's wrongful acts); *cf. Mattyasovszky v. West Town Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509.

We need not address this issue further because a private corporation, unlike a municipal corporation, does not have a statutory immunity. The immunity was intended, presumably, to protect the taxpayers' money. If a private corporation is assessed punitive damages for its own acts it must pay out of corporate funds. Insurance is not available for the punitive damages award in that situation for the public policy reasons cited above. Whether or not insurance would be available if the corporation established that it was liable only vicariously, through the acts of an employee or agent who was not a corporate officer, is not at issue in this appeal. Because we have determined that the Park District's purchase of liability insurance has not waived its immunity from punitive damages, we affirm the trial court's dismissal of the punitive damages count and its vacation of the jury's verdict on that count.

Accordingly, we affirm the trial court on both the main and cross appeals.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.