AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Guardian of the Estate of FRANK ST. JOHN, a Minor, Plaintiff-Appellee, *v.* ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Defendant-Appellant.

(No. 54496;

First District—May 17, 1971.

*Rehearing denied June 30, 1971.*

Hackbert, Rooks, Pitts, Fullagar & Poust, of Chicago, (Harlan L. Hackbert, of counsel,) for appellant.

Richard G. Finn and John J. Kennelly, both of Chicago, and Vincent J. Biskupic, of Oak Park, for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

Defendant, Elgin, Joliet and Eastern Railway Company ("Railway") appeals from a judgment in favor of American National Bank and Trust Company of Chicago, as guardian for Frank St. John, a minor, plaintiff, for personal injuries. After trial without a jury, the court found the issues in favor of plaintiff and entered judgment for $275,000.00. No issue is raised regarding damages.

On October 16, 1958, when plaintiff was approximately one month over the age of seven, he was severely injured by a moving freight train operated by Railway on its tracks on the south side of Chicago. For better comprehension, we commence with a description of the area and of the occurrence.

Calumet Park is a public park slightly under 200 acres. It is irregularly shaped with its east boundary formed by Lake Michigan. The park is located between 95th and 101st Streets. The right-of-way owned by Railway runs in a curving direction generally northwesterly along the western boundary of the park. The tracks curve to the northwest in a large arc until 100th Street; run due north for about two blocks to 98th Street; then curve again rather sharply to the northwest to 97th Street and then run diagonally northwest to 95th Street. Photographs and other evidence show that a large field house is located inside the park with an entrance close to 98th Street. There is an access drive in the park curving from time to time and running generally northwest and southeast. The

northern portion of this drive terminates by merging into 95th Street where there is a railroad crossing. There is no crossing of the right-of-way at 96th or at 97th Streets. There are crossings at 98th Street, 99th Street and 100th Street. All crossings are at grade.

There is considerable evidence as to the recreational and educational facilities of Calumet Park. During material times, the park had some Little League and baseball diamonds, a football field, a running track and a beach for swimming. Various activities for children were carried out within the field house.

The area west of Railway's right-of-way is a heavily populated residential tract with many children. There is a public school on 99th Street some 200 feet west of the right-of-way and there is a Catholic grammar school at 95th Street to the west of the right-of-way. The park has generally been well attended and used by both children and adults. For example, a total of 19,000 persons used the park in January of 1946 and 69,000 used it in July of 1946. Population increase has undoubtedly expanded these figures in a proportionate manner.

The record is replete with evidence of the presence of children not only within the park and traveling to and from the area, but crossing, and being present upon, the Railway right-of-way. Virtually every witness called by plaintiff, including employees of Railway, such as the switch-engine foreman from the train in question and even the General Superintendent of Railway, called by defendant itself, testified to the presence of children going in and out of Calumet Park, crossing the Railway right-of-way and even running up and down the tracks.

There is no fence along the western border of the right-of-way between 95th Street and 101st Street. During the year 1941, steps were taken toward fencing the eastern edge of the right-of-way. On May 13, 1941, Railway entered into a written agreement with the Chicago Park District. This agreement provided that Railway would convey certain irregularly shaped lots and parcels along the right-of-way to the Chicago Park District. In return, the District was to secure and consent to vacation of portions of certain streets in the area so that it could convey these parcels to Railway. The agreement further detailed the boundary line between the park and the railroad from the north line of 98th Street to the north line of 95th Street. Railway further agreed that, "as soon as weather conditions would permit, it will furnish, erect and maintain a seven foot chain link type wire fence along the aforesaid boundary line."

Pursuant to this agreement, and on June 9, 1943, Railway executed and delivered to the Chicago Park District a quit claim deed conveying the parcels of real estate described in this agreement. The deed was duly

acknowledged and recorded. This deed contains a covenant by Railway that it would, "within a reasonable time from and after the date hereof, make and set up and forever thereafter maintain, at the cost and expense of the party of the first part, in a proper and substantial manner, a seven foot chain link type wire fence on and along said boundary." In due course, a fence as described was installed by Railway at its own expense. However, the fence did not go to the north line of 98th Street but stopped at a distance of from 100 to 200 feet north of that line. The exhibits and testimony show without contradiction that for many years it was the custom of persons in the area to walk around the southern end of this fence so.that a well defined and easily observed path came into existence around the southern end of the fence north of 98th Street leading from park property onto the right-of-way.

The parties stipulated that when this fence was erected in 1943, it extended for 1,860 linear feet. The cost of installation was $2.39 per foot or a total of $4,422.00. Computation shows that the cost of extending the fence to the north point of 98th Street, in accordance with the agreement and the covenant in the quit claim deed, would have been from $239.00 to $578.00 depending upon whether the unfenced distance was 100 or 200 feet.

One further fact regarding operation of the Railway must be noted. Railway carries no passengers but the right-of-way in question is used exclusively by freight trains; most or many of which operate to and from facilities of the United States Steel Company and Material Service Company. The plant of the former is located north of the Calumet River and the latter plant is on the south bank. The river is several blocks north of Calumet Park. The trains using this right-of-way could vary from 5 to 60 or even 100 cars. A train of 100 cars would be approximately one mile long. If the bridge across the Calumet River was open so that trains could not proceed north, a situation would develop in which a standing train would effectively block access to the park from 98th, 99th and 100th Streets. Sometimes access would also be blocked at 95th Street.

There is considerable evidence in the record to show that when this occurred impatient children and adults would cross the right-of-way by clambering over or under the couplings of the standing cars. Furthermore, there is evidence that people, including children, would walk around the end of the fence and then walk north along the tracks in the process of reaching their homes west of the Railway. There is evidence that children would flip rides on the train and then jump off at the street crossing closest to their homes. In this activity, children would

sometimes play along the right-of-way. The record also shows that Railway had ample notice and was well aware of the prevalence of these activities.

Prior to 1946, the three crossings over the right-of-way at the western edge of Calumet Park at 98th, 99th and 100th Streets were each protected by watchmen at all hours of the day and night. Railway then erected a two-story tower at the 100th Street crossing and installed mechanical gates at the other three crossings in question. This was done pursuant to approval obtained from the Illinois Commerce Commission during 1946. Operation of the three gates was controlled from the elevated tower at 100th Street which was in constant operation during the day and night.

A complaint was filed with the Illinois Commerce Commission as a protest against the elimination of the watchmen. The Commission held hearings at which the City of Chicago, the Chicago Park District, Railway and other interested persons were present. The Commission denied the petition for retention of watchmen. Witnesses before the Commission complained of the blocking of crossings by trains. However, Railway proposed to overcome this by stopping trains south of 100th Street whenever the Calumet River Bridge was open. The system of gate control thus approved was arranged so that when crossings were occupied by a train the gates could not be raised.

Thereafter, and during 1953, another order of the Illinois Commerce Commission provided for installation of a system of automatic gate control to replace manual control from the tower. Electric circuits automatically light flashers and activate gates at all three of these crossings whenever a locomotive enters a certain area. When the train leaves, resumption to normal is automatic. However, these changes did not prevent blocking of the crossings when the Calumet Bridge was open and did not in any manner prevent or even inhibit the activities of children and adults in proximity with the tracks and the right-of-way. The automatic system was in operation at the time of the occurrence in question during October, 1958. Passage of the train had lowered the gates and put the flashing signals into operation at the 98th Street crossing.

The record shows in another manner the habits and customs of children in the area concerning Railway. In May of 1956, a thirteen year old boy entered Calumet Park in the company of a group of students escorted by a teacher. The gymnasium teachers at the area grammar school occasionally took their classes over the right-of-way and into the park for play and recreation. This particular student, in the process of returning home, cut over the right-of-way at the unfenced area south of 99th Street, approached the tracks and attempted to jump onto a moving

train. Shortly south of 99th Street he fell from the train and was injured.

On October 16, 1958, plaintiff was accompanied by his brother, then eight years old, another boy of about the same age and another of about ten years. They had gone to Calumet Park to apply for woodcraft lessons at the field house. They were given forms for signature by their parents. All of them lived in the area west of Railway. Plaintiff and his brother lived on Avenue L near 97th Street about a block west of Railway's tracks.

All of the boys went home and procured the necessary permission. They then returned to the park. They stayed in the field house for about half an hour. Then they occupied themselves on the grounds outside and to the north of the field house. By this time, at about 6 o'clock, one of the boys expressed the need to return home for supper. At that time, there was a northbound freight train, operated by Railway, at about 98th Street. The train was moving slowly and its speed has been described as five or ten miles per hour. The boys ran down to the end of the fence, then around it and onto the right-of-way where they turned and ran north. Their intention was to run alongside the tracks to arrive at the 95th Street crossing before the train. This would enable them to cross over the right-of-way at 95th Street and to return to their homes.

Plaintiff was running three or four feet away from the side of the train between 97th and 98th Streets at an area where the track curved to the west. Plaintiff stopped and knelt down beside the track to remove some burrs which had adhered to his trousers. He then started running again. Apparently he was the last one in the line of running children. As plaintiff started to run, some three or four feet from the moving train, he tripped on some cinders which were along the tracks and fell partly beneath the train. As a result, his right leg was amputated above the knee and his left leg and foot were injured.

Railway urges three separate propositions for reversal of the judgment:

1. No right of action for negligence may be predicated on the agreement between Railway and the Chicago Park District concerning installation of the fence;

2. Railway had no common law duty to fence the right-of-way, and therefore, there is no common law basis for liability; and

3. Failure to construct the fence to the north line of 98th Street was not the proximate cause of plaintiff's injuries.

■■ We will consider the second point first. The facts here show a most unusual situation. The location of Railway and its necessary activities require its trains to operate directly between Calumet Park and a heavily populated residential area. As a result, large numbers of children are obliged to cross the tracks each day. This court has previously pointed out that, "a moving railroad train is certainly an instrumentality of great

potential danger to children  *  *  *." (*Dickeson v. Baltimore Ry.*, 73 Ill.App.2d 5, 18.) In the situation here, the constant presence of children in dangerous vicinity to the tracks, and thus the possibility of serious injuries, was not only reasonably foreseeable but might be termed inevitable. Further, the evidence is strong, convincing and uncontradicted that the Railway had full, complete and continuing notice of this entire situation.

■■ We, therefore, approve the finding and judgment of the trial court on the basis that Railway was guilty of common law negligence in failing to complete the fencing of the eastern edge of its right-of-way to the north boundary of 98th Street. This result is amply supported and in fact dictated by the decisions of this court. (*Dickeson v. Baltimore Ry.*, 73 Ill.App.2d 5; *American National Bank v. Pennsylvania Ry.*, 52 Ill.App.2d 406.) In both of these cases, this court imposed liability upon the basis of common law negligence of the railroad.

Both of these decisions were affirmed by the Supreme Court. In *Dickeson*, the Supreme Court stated that there was sufficient evidence from which the jury could find negligent operation of the train. (*Dickeson v. Baltimore Ry.*, 42 Ill.2d 103, 106.) The Supreme Court also stated that the question of "the applicability of the attractive nuisance principles set forth in *Kahn v. Burton*, 5 Ill.2d 614  *  *  * need not be decided in this instance  *  *  *." (42 Ill.2d 103, 109.) In *American National Bank*, the Supreme Court did not consider the applicability of the attractive nuisance doctrine but affirmed the judgment against the defendant railroad. (*American National Bank v. Pennsylvania Ry.*, 35 Ill.2d 145, 153 and 154.) We hold expressly that this record contains ample evidence to support a finding and judgment against Railway on the basis of common law negligence in violation of its duty as an occupant of land. Railway owned the right-of-way and operated the dangerous instrumentality thereon. The cost of remedial fencing was minimal. We need not depend upon decisions from other jurisdictions in reaching this conclusion. We will merely note that the concept of common law negligence has been specifically applied to railroad fencing in decisions such as *Mann v. Kentucky & Indiana Terminal R.R. Co.*, (Ky.App. 1955) 290 S.W.2d 820 and *Altenbach v. Lehigh Valley R.R. Co.*, 349 Pa. 272, 37 A.2d 429.

■■ The next contention of Railway involves the issue as to whether its failure to complete the fence was the proximate cause of plaintiff's injury. Existence of proximate cause is a question of fact which it was the duty of the trial court to determine. (*Walsh v. Dream Builders, Inc.*, 129 Ill.App.2d 280, 290; *Madison v. Reuben*, 128 Ill.App.2d 11, 16; *Napier v. DiCosola*, 126 Ill.App.2d 324, 328.) The trial judge expressly held that failure to complete the fence to the north boundary of the 98th Street

crossing was the proximate cause of plaintiff's injury. In our opinion, this finding is more than amply supported by the evidence. The existence of the well defined path curving around the south tip of the fence as installed and all of the other physical facts and circumstances in this record convince us that the fence should have been completed by Railway to the north edge of the crossing. It is most reasonable to conclude that this would have impelled children and other persons traversing the crossing between the park and the residential area to use the crossing at 98th Street and would have served to eliminate much of the indiscriminate use of the railroad tracks. We expressly approve the finding of the trial court that failure to complete the fence was the proximate cause of plaintiff's injury.

The remaining issue is that first raised by Railway regarding the use of the 1941 agreement between Railway and the Chicago Park District as a basis for the finding of negligence. Railway argues that the Illinois Commerce Commission acquired sole power to impose fencing requirements upon it by the 1957 amendment to the Public Utilities Act (Ch. 111-⅔, sec. 61) and that this amendment terminated the duty of Railway under the 1941 agreement. It is indeed difficult to conceive any basis for materiality of this 1957 amendment. The statute cannot alter the basic fact that Railway entered into the contract to erect and maintain the fence and then breached it. The problem here is not enforcement of the contract at this time but is a determination of the effect of the preexisting breach of contract upon the rights of the parties to this litigation. However, under our view of this case, as above stated, a consideration of this issue is not necessary. If the 1941 contract is indeed voided by the statute vesting power in the Commerce Commission, this cannot affect the finding of common law negligence. The finding of the trial court is presumptively based only on the competent evidence in support thereof. (*Hunter v. DeMay*, 124 Ill.App.2d 429, 437; *Levy v. Levy*, 117 Ill.App.2d 194, 211; *Abraham Lincoln Memorial Hospital Corp. v. Gordon*, 111 Ill.App.2d 179, 184.) Conversely, if the 1941 contract retains binding force, its breach is merely additional and cumulative evidence of the negligence of Railway. We, therefore, expressly abstain from deciding the issue of present validity and legal effect of the contract in the light of the 1957 amendment to the Public Utilities Act.

After oral argument, counsel for plaintiff filed a motion requesting us to take judicial notice of four certified copies of proceedings and orders of the Illinois Commerce Commission appended thereto. General Order No. 31478 of the Commission entered June 8, 1943, authorized Railway to "perform all acts necessary to give effect to the aforesaid agreement dated May 13, 1941" between Railway and the Chicago Park District. The

remaining certified copies are various orders entered by the Commission regarding fencing of the right-of-way by other railroads in unrelated matters. Railway has filed objections to this motion. We have taken this motion with the case; but, in view of the above conclusions reached, we find action thereon unnecessary.

We, accordingly, conclude that the judgment as entered in favor of plaintiff should be and it is hereby affirmed.

Judgment affirmed.

BURKE, P. J., and LYONS, J., concur.