THE CHICAGO PARK DISTRICT *et al.*, Plaintiffs-Appellees, v. CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant-Appellant (John Engel, Defendant).

First District (4th Division)   No. 1—90—2721

Opinion filed December 18, 1992.

*Justice McMorrow participated in this disposition prior to becoming a member of the supreme court of Illinois.

Connelly, Mustes & Schroeder, of Chicago (Michael P. Connelly and Patrick J. Falahee, Jr., of counsel), for appellant.

Hinshaw & Culbertson, of Chicago (Patricia J. Prange, Nancy G. Lischer, and Brian F. Barov, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

In an earlier appeal, this court affirmed a $5 million verdict against the Chicago Park District and in favor of John Engel, a minor, who was severely injured as he climbed down from a moving freight train. (*Engel v. Chicago & North Western Transportation Co.* (1989), 186 Ill. App. 3d 522, 542 N.E.2d 729, *appeal denied* (1989), 128 Ill. 2d 662, 548 N.E.2d 1068.) Just after the trial began, Engel dismissed the Park District's codefendant, Chicago & North Western (CNW). The Park District's insurance company, California Union Insurance Company (Cal Union), paid the judgment in full after the Park District was unsuccessful in seeking further review of the judgment by the Illinois Supreme Court.

In November 1987, more than six months after the jury returned its verdict, the Park District and Cal Union instituted the pending de-

claratory judgment action against CNW, seeking to enforce an alleged "sharing agreement" under which the codefendants each had agreed to pay one-half of any verdict or recovery that Engel might receive by verdict or settlement of his personal injury lawsuit. CNW argued that it was not liable under the alleged sharing agreement, arguing primarily that the agreement had been obtained or tainted by fraud. The trial court, sitting without a jury, entered judgment in favor of the Park District, allowing it to recover from CNW one-half of the $5 million judgment it had paid, plus a *pro rata* share of the accumulated interest. The total amount of the Park District's award was in excess of $3 million.

CNW appeals, arguing that (1) the alleged sharing agreement is void; (2) the trial court applied an erroneous standard in assessing the reasonableness of CNW's reliance upon documents it received in discovery; (3) clear and convincing evidence established that CNW was induced by fraud or mistake to enter into the agreement; (4) the trial court misconstrued the adverse agent doctrine; (5) the trial court erred in failing to apply the unclean hands doctrine; and (6) the Park District breached the implied duty of good faith and fair dealing.

For the reasons that follow, we reverse the judgment.

BACKGROUND

In September 1981, John Engel, 12 years old, attempted to mount, ride, and then dismount a slowly moving freight train in the manner he often had seen other children and railroad employees do without incident. This practice is called "flipping" the trains. Engel had gained access to the tracks upon leaving Hermosa Park through a large opening in a fence owned and maintained by the Park District. After a short ride on one of the trains, Engel fell as he tried to jump off. His leg was crushed beneath the train, pinning him to the tracks as each car rolled over his leg.

A key part of the Park District's defense depended on proof that it had made reasonable attempts to inspect and maintain the opening in the fence. Some evidence indicated that vandals kept cutting open the fence, after repairs, to create a shortcut through the railroad property. Internal park district memoranda, however, acknowledged the opening in the fence as a "very dangerous" condition and safety hazard. At trial there was substantial evidence showing that the fence had not been repaired for at least two years. Nevertheless, the Park District's safety inspector in charge of Hermosa Park, Frank Barton, testified at trial regarding the reports he had kept of the fence which

suggested that the opening had, in fact, been in good repair just weeks before Engel's accident.

During discovery, the Barton inspection reports spanning two years were produced in the form of photocopies. The attorneys for Engel and CNW did not see any original reports until the trial itself, however, when Engel's attorney renewed his previous requests for originals or legible copies of the Barton inspection reports. As soon as he saw what purported to be the originals of six such reports, he immediately doubled Engel's settlement demand and hired a forensic documents examiner. The testimony of the documents examiner strongly suggested that Barton's six "original" safety inspection memos all had been created at the same time, on the same legal pad, and with the same pen, even though they purported to be business records spanning two years of inspections. This testimony came in after Barton had denied at trial that he created them all at one time or otherwise than in the ordinary course of business.

The jury awarded Engel $5 million in compensatory damages and $1.5 in punitive damages. The trial court entered judgment on the compensatory damages verdict but set aside the punitive damages award as being unauthorized by law. We affirmed the trial court's rulings on appeal. *Engel v. Chicago & North Western Transportation Co.* (1989), 186 Ill. App. 3d 522, 542 N.E.2d 729.

The Park District had sought reversal of the jury's verdict on appeal, primarily on the ground that it owed no legal duty to the plaintiff because of the open and obvious danger of flipping trains. The Park District alternatively sought a new trial, arguing that the jury's anger had been "fueled" by the expert's testimony suggesting that Frank Barton's inspection reports had been falsified. In rejecting that argument we noted, among other things, that any such "inflamed passions" were caused by the Park District's evidence, not by anything plaintiff had done. We also commented, "Ironically, the anger that the Park District now argues deprived it of a fair trial grew out of its presentation of apparently fabricated documents and untrue testimony as to the repairs made to the fence in Hermosa Park. If the jury believed that it had been lied to, and the record supports this possibility, it is hardly surprising that the jurors may have become angry." (186 Ill. App. 3d at 532, 542 N.E.2d at 735.) Neither the trial judge nor this court was then aware that Barton, shortly after testifying, actually had *admitted* to the Park District's attorney that he had given false testimony regarding the authenticity of the "original" inspection reports.

While the *Engel* appeal was pending, the Park District filed the instant declaratory action seeking to recover from CNW one-half of the judgment amount pursuant to the sharing agreement. CNW denied that a valid contract had come into existence and raised certain affirmative defenses, including the Park District's fraudulent concealment and unclean hands. CNW also counterclaimed for rescission of the sharing agreement based on theories of fraud in the inducement and mistake.

### THE *ENGEL* LITIGATION

Because of the issues presented in the pending appeal, we must review portions of the original *Engel* litigation, which are included as part of the record. The evolution of the sharing agreement and subsequent occurrences cannot be separated from the trial of that case. The pending appeal focuses, however, on the formation of the agreement itself and the impact of the subsequently discovered fraud on its enforcement.

The *Engel* complaint was filed in 1982 against both CNW and the Park District as the parties whose negligence had proximately caused plaintiff's injuries. The Park District's liability was premised on its control over and maintenance of the fence that separated Hermosa Park from the railroad yard beyond. CNW's liability was premised on its ownership of the land on which the accident occurred as well as its ownership and control of the freight train, the instrumentality on which Engel was injured. Both defendants took the position, however, that they owed no legal duty to the 12-year-old plaintiff because of the open and obvious dangers inherent in boarding moving trains. Alternatively, they believed that Engel's contributory negligence would reduce damages significantly.

CNW's in-house counsel, George Brant, was responsible for preparing CNW's defense. The Park District and its insurer, Cal Union, retained private counsel, Charles Kralovec. In addition, the Park District's assistant general attorney, Maureen Connors, was responsible for the Park District's compliance with discovery requests. From the beginning of discovery, the frequency with which the Park District inspected and repaired the fence was in issue because the Park District's defense was that it had acted reasonably in maintaining the fence. In addition, the ownership and maintenance of the fence was put in issue because the Park District's initial discovery answers were inconsistent on that point. By the time of trial, however, the Park District did admit responsibility for maintaining the fence.

One of the central discovery problems in the *Engel* litigation concerned the documentation of the Park District's efforts to inspect and repair the fence in question. The Park District furnished discovery responses indicating that regular inspections had, in fact, been made. Although there were some inconsistencies and omissions from the beginning, the Park District's attorneys assured the other parties that they were diligently searching for complete records as well as explanations for inconsistent responses.

Both Brant and Kralovec cooperated with each other throughout the pretrial phases of litigation. They engaged in on-going settlement discussions with Engel's attorneys. The codefendants' attorneys also discussed the possibility of entering a sharing agreement under which their clients would share responsibility for any settlement or damages awarded to Engel against either or both defendants. This would allow the codefendants to concentrate on a united defense and focus on Engel's conduct while avoiding a situation where they would be helping the plaintiff's case by blaming each other for causing Engel's injuries.

As the lengthy record in this case reveals, the parties were actively pursuing discovery, which was forthcoming in bits and pieces, and preparing the case for trial at the same time they were discussing settlement and the sharing agreement. CNW and the Park District did finalize a written sharing agreement just before trial, which the Park District and Cal Union executed and returned to Brant on March 30, 1987. CNW, however, never signed the agreement, stating that its excess insurance carrier would not approve it. Accordingly, on April 1, 1987, as the jury was being selected, CNW notified the Park District that it did not consider itself bound by the sharing agreement. In response, the Park District stated its intention to file a counterclaim for contribution, although it did not do so. Notwithstanding CNW's repudiation of the sharing agreement, the two defendants remained in a cooperating posture for trial. Their attorneys continued pursuing a settlement with Engel's attorney.

The events that are most critical to this appeal began the next day, April 2, 1987. In the morning the parties made their opening statements. Engel's attorney, Howard Schaffner, had made a settlement demand to defense counsel, in the amount of $900,000. The two defendants took the noon hour to consider this proposal and the record shows that Brant told Kralovec that CNW was willing to contribute $350,000 and that Cal Union should put in the remaining $550,000. Kralovec responded that in light of the previous agreement to share equally, Cal Union thought the division was unfair. Brant

then suggested that Cal Union contribute the $550,000 on behalf of the Park District to settle with Engel and reserve the right to contest the apportionment at a later date. Back in the courtroom after lunch Kralovec told Brant that Cal Union would go along with the proposal subject to the reservation.

While codefendants' attorneys were preparing to meet Schaffner's settlement demand, Schaffner was examining, for the first time, the six "originals" of Frank Barton's inspection reports that had been furnished as photocopies during discovery. Based on his visual inspection of the reports that were hand-printed in black ink on yellow legal paper, Schaffner retracted the $900,000 settlement demand, increased it to $2 million, and immediately contacted a forensic documents examiner.

Brant had never seen the originals of the Barton reports. Both Kralovec and Brant testified in the pending case that at the time Schaffner more than doubled the settlement demand they did not know why he had done so.

During the *Engel* trial, Schaffner called Frank Barton as an adverse witness. He testified on Friday, April 3, and Monday, April 6, 1987. Schaffner questioned him closely as to the creation of the six "original" inspection reports. Barton denied that he had prepared the reports all at the same time with the same pen and insisted he personally had prepared each one on the dates indicated, at the time he made the inspections.

On April 6, following the completion of Barton's testimony, Schaffner renewed his $2 million settlement demand. By then he had also informed opposing counsel and the court of his intention to call James L. Hayes to testify as an expert. The court had not yet ruled on the admissibility of expert testimony, however. Schaffner told defense counsel that unless he got a favorable response to his increased demand, he would dismiss CNW from the case after the noon recess.

Kralovec told Brant that if Schaffner actually did dismiss CNW, he would file a counterclaim for contribution. Nonetheless, before the trial resumed on April 6, Schaffner and Kralovec made a final effort to settle the case. Brant was present when Kralovec called Cal Union for authorization to offer Schaffner $1.25 million. Cal Union refused to go over $1 million, but Schaffner indicated that he would not settle for less than $1.25 million. After this final effort failed, Schaffner did dismiss CNW from the trial, with prejudice, and proceeded against the Park District alone. The Park District never did file a counterclaim for contribution against CNW.

The next day, Kralovec asked Frank Barton to come to his office to discuss the matter of the six "original" inspection reports. Barton then admitted that he had not testified truthfully; his wife had recreated the reports from information he had given her. The Bartons said they thought it would be "better" to have originals and so they simply recreated the reports that they said should have been in Barton's supervisor's file. Supposedly, Barton had some copies of his original reports at his house and when the originals were found to be lost or missing from the supervisor's files he had his wife copy the copies on yellow legal paper. Kralovec conveyed this information to the Park District and Cal Union but not to the trial judge or plaintiff. Although CNW was no longer in the case, Kralovec called Brant on April 7 to discuss the matter with him also.

Brant testified in the pending trial on the sharing agreement that he had been very upset to hear this "absolutely incredible development," especially since Barton had testified in his deposition that he did *not* keep copies of his reports and that only the originals were kept in the supervisor's files. Brant told Kralovec the Park District now had a big problem with the jury and at the least Kralovec would have to call Mrs. Barton as a witness to explain her role in the recreation of records. He also noted that someone would have to explain why Barton was in the supervisor's files and how someone from the Park District had determined that there were missing originals to begin with. Brant concluded by telling Kralovec that it was, basically, the Park District's problem.

On April 8, Kralovec took the deposition of the expert witness, James L. Hayes. Over Kralovec's strong objection based on the untimeliness of the request to use an expert, Hayes was permitted to testify. The court barred Hayes from giving an ultimate opinion that the Barton originals were not authentic, however. Hayes was allowed to explain the photographic technique he used to bring up the imprints that were made on each yellow paper from the pressure of a pen on the page above. In a dramatic fashion, this testimony demonstrated that, for example, the report dated July 12, 1979, contained indentations or imprints from one dated September 12, 1979. Each of the six originals, purportedly spanning a two-year period, bore similar imprints, suggesting that they had all been written up in one sitting.

In chambers, Kralovec moved, unsuccessfully, for a mistrial based on Hayes' testimony. The fact that a Park District employee and witness had lied on the stand was never disclosed to the court, and on appeal the Park District continued to protest the admissibility of

Hayes' testimony and the prejudicial impact it had on the defense of the case.

THE TRIAL ON THE SHARING AGREEMENT

On January 31, 1990, the trial court in the pending case began hearing the Park District's declaratory action for enforcement of the alleged sharing agreement between CNW and the Park District. The trial court, sitting without a jury, first heard evidence on the formation of the contract. Next, the court heard CNW's evidence on the affirmative defenses and counterclaims sounding in fraud and mistake. Much of the evidence consisted of excerpts from the first trial, as well as depositions, correspondence, and other written material that was part of the discovery in the personal injury lawsuit. We have summarized some of this evidence above.

PARK DISTRICT'S CASE FOR ENFORCEMENT OF SHARING AGREEMENT

Three witnesses were called to support the Park District's complaint. The claims manager for Cal Union identified proposed drafts of the sharing agreement as well as the final form that Cal Union received and signed sometime during the week of March 23, 1987. He stated that Cal Union ultimately paid the *Engel* judgment on behalf of its insured, the Park District. No Park District money was paid in satisfaction of the judgment.

Next to testify was Circuit Court Judge Maureen E. Connors, who was at the time relevant to the *Engel* litigation an assistant general attorney for the Chicago Park District. Her responsibilities in that position included handling discovery for the Park District's outside counsel in personal injury cases. She testified that she worked with Kralovec in the litigation and that he asked her to sign the March 23 sharing agreement. She did so, after obtaining her supervisor's permission. She believed that she was authorized to execute the document on behalf of the Park District and acknowledged that Cal Union determined the terms of the sharing agreement.

Charles Kralovec, lead trial counsel for the Park District, testified that from 1981 up until the 1987 trial there had been many pretrial conferences and discussions. Kralovec said that he had suggested, at one point, that CNW pay 75% of any sums awarded to Engel and that the Park District and Cal Union pay 25%. After further negotiating the defendants settled on the equal division principle. In February 1987 Brant sent him a letter and draft agreement, which Kralovec forwarded on to Cal Union and the Park District. After revising a second draft, dated March 4, the parties communicated their oral

agreement and Brant then sent a third written document, on or about March 23, asking Kralovec to obtain signatures from the Park District and Cal Union.

Kralovec and Brant continued settlement talks with plaintiff. Trial was set for March 31, and on April 1, 1987, the parties began selecting the jury. On that day Brant called Kralovec to inform him that he could not permit CNW to sign the sharing agreement because the excess carrier would not approve it. Kralovec said that he and the claims manager from Cal Union were "flabbergasted" that CNW was not going ahead with the agreement.

Kralovec testified that he did not file a counterclaim against CNW because he did not believe it would be in the best interest of either defendant to do so. He admitted that any such counterclaim would be for contribution. He further acknowledged, as a matter of law, that claims for contribution from other tortfeasors must be filed during the pendency of the principal action. Kralovec also conceded that when CNW was dismissed out of the case, it was not pursuant to any good-faith settlement that would have barred the filing of the Park District's claim for contribution. He admitted that he could have filed such a claim during the remaining days of the trial, having been put on notice of CNW's withdrawal from the sharing agreement before any evidence at trial was taken.

Following Kralovec's testimony, the Park District rested. CNW moved for a directed finding on several grounds: (1) Connors lacked authority to bind the Park District to the sharing agreement and therefore it was never validly formed; (2) the Park District lacked standing to sue because it had no money at stake and had paid nothing toward the *Engel* judgment; and (3) there had been no meeting of the minds sufficient to form a valid contract and there was no basis for finding promissory estoppel. After substantial discussion, the trial court denied the motion for directed finding.

DEFENSE CASE AND COUNTERCLAIM FOR RESCISSION

CNW called George H. Brant, an attorney employed by the company since 1973, as its first witness. He was in charge of the *Engel* litigation. As revealed through his written memos, letters, and testimony at the hearing, Brant kept track of the litigation by reviewing discovery responses and evaluating the case in terms of settlement. Brant testified that as trial counsel for CNW he had to focus on his own client's conduct, the plaintiff's conduct, and codefendant's conduct. He explained his litigation strategy and the on-going process of evaluating the discovery responses.

In early 1983, the Park District filed answers to interrogatories involving the maintenance and repair of the fence that separated Hermosa Park from the railroad tracks. In its original answers the Park District stated that it did maintain and repair the fence but in a supplemental answer filed at the same time the Park District stated that it did not own the fence and therefore was not responsible for maintaining it. Brant noted this inconsistency in a March 1983 memo in which he stated his intention to take depositions of Park District personnel. In April 1983 the Park District filed amended answers to interrogatories, listed repairs that had been made, and named Frank Barton as the "fence inspector."

In May 1983 Brant wrote to Kralovec for repair and construction lists. By this time, approximately a year after the case was filed, Brant believed that the plaintiff's behavior was at least "careless" in light of the circumstances but that the boy had sustained a grievous injury. Further, Brant thought the Park District's discovery answers indicated that the fence had been kept in reasonably good repair. Accordingly, he explored the possibility of structuring a settlement offer to Engel in the range of $400,000 or $500,000, with both defendants contributing on an equal basis.

Frank Barton testified in his deposition of June 1983 that he was the safety inspector for the park and visited it once or twice a month to perform inspections and request repairs. He said that the fence in question was frequently subjected to vandalism, particularly in the northwest corner through which Engel had passed. Barton testified in his deposition that he mentioned the hazard to children in his reports and requested repairs. Barton's inspection reports and notes were not available at his deposition, but he said they should be in the office of his supervisor, Coger Lee, at the Park District offices.

Brant testified, in the pending case, that he had believed Barton was a credible witness who was telling the truth in his deposition and that the inspection reports and records would bear out his testimony.

In September 1983 Brant suggested to Kralovec that in light of the remaining number of depositions and discovery yet to be done at plaintiff's request, the two defendants should consider a structured settlement proposal to resolve the case within reasonable limits. Brant thought each defendant should share equally in the payment to plaintiff. The 50/50 split was based on Brant's impression that there was nothing particularly unusual about either defendant's case; the Park District's answers indicated that it had tried to secure the fence through periodic inspections and repairs and CNW's employees had

acted in a reasonable manner as well. Kralovec, however, responded in December 1983 that Cal Union would not agree to a 50/50 division.

By March 1984 Brant had received additional discovery responses from the Park District, including some copies of Barton's inspection reports. In a memorandum Brant analyzed the reports and compared them to other materials provided through the deposition of other Park District employees. He noted that some of the references to repairs in the records did not mesh with some of the other documents. Accordingly, Brant filed a request to produce on the Park District. He thereafter obtained plat maps of Hermosa Park, which helped him determine that the fence was, in fact, owned by the Park District.

Kralovec testified during CNW's case in chief on the affirmative defenses and counterclaims. He identified a June 12, 1984, letter to Cal Union's claims manager in which Kralovec had expressed concerns regarding the Park District's compliance with discovery requests, particularly with respect to the repair of the fence. The letter stated that he had repeatedly requested documents from Maureen Connors, who told him she had done everything she could do to obtain the records that had been compiled by Park District personnel but not turned over to her.

Thereafter, Engel's attorney moved to strike the pleadings of the Park District for noncompliance with discovery. In May 1985, a month before the scheduled hearing date on the motion to strike, Cal Union sent a letter to the Park District in which it said it was "reserving its rights based upon the cooperation clause in the insurance policy." Cal Union stated it would not pay any default judgment based upon the Park District's failure to respond to discovery requests.

At about the same time, CNW served a request to admit facts upon the Park District. Shortly thereafter Maureen Connors forwarded to Kralovec certain repair memos, incident reports, and safety reports.

Brant testified that he did not receive originals of any documents but did not expect to, since it is customary to exchange copies in discovery. He also stated that there was nothing in the materials provided to him suggesting that the photocopies of Barton's reports were not made from authentic originals.

In August 1985 Brant attended a meeting among representatives of Cal Union and the Park District to discuss a settlement with plaintiff and the percentage each defendant should bear. Nothing was said about the sufficiency of discovery; each side was arguing legal theories as to which defendant likely would be perceived as "more" negli-

gent. At this point the parties considered paying as much as $500,000 each if necessary but agreed to make a lower offer to plaintiff.

Brant identified a letter he wrote in December 1985 to Kralovec's law firm regarding depositions that had just been completed. He expressed concern that certain Park District witnesses appeared "less than candid." Specifically, Brant questioned the deposition of Jerome McKinney, the Park District's head of security and immediate supervisor of Frank Barton. Some of the documents produced at the deposition bore McKinney's typed name and were dated in 1979 and 1980. McKinney testified, however, that he had *not* been the supervisor in 1979 and 1980; he did not even begin employment with the Park District until January 1981. Coger Lee, who was McKinney's predecessor as director of safety for the Park District, also testified in his May 1986 deposition that McKinney could not have been the author of the memos in question. Coger Lee further testified that he, himself, had not put McKinney's name on the documents.

The McKinney memos were unsigned, typewritten summaries of safety inspections allegedly performed by Frank Barton in Hermosa Park. Other documents produced at the McKinney deposition were copies of hand-printed reports from Frank Barton, some of which were addressed to McKinney and some to Coger Lee.

In his letter to Kralovec's firm regarding the depositions, Brant explained his concern that although he did not suggest the law firm was responsible, "these [continuing] discovery omissions could have a detrimental effect on settlement or trial to the extent that they inflate the value of the case." Brant warned that if the problems were not satisfactorily resolved the defendants might be reaching conclusions as to their respective liability based on false or inaccurate information. In the trial of the pending case, Brant explained that when he wrote the letter he felt the discovery problems might create a distraction that could be exploited at trial if it appeared the Park District's discovery responses were less than candid.

Brant testified that up to the problem with the McKinney memos he had believed the Park District's discovery was basically complete and candid and had shown regularity in inspection and repair of the fence. The revelations in the McKinney deposition, however, "blindsided" him. At that time he did not doubt the Barton documents but was focusing on how McKinney's name appeared on documents that predated his employment.

Kralovec's associate, D'Arcy, wrote back to Brant in January 1986 that he had "no idea" why the inner-office memos were typed over McKinney's name. D'Arcy strongly denied any inference that docu-

ments had been hidden or destroyed and expressed resentment that Brant might be insinuating a "taint" regarding the discovery.

Brant testified that, based on D'Arcy's response, he was reassured that the Park District attorneys were going to obtain an explanation for the appearance of McKinney's name on the memos.

Kralovec testified that he brought the McKinney memos to the attention of Cal Union in a letter dated January 31, 1986. He had made inquiries but was still investigating. Kralovec explained that when he wrote the letter his tentative conclusion was that someone had told a secretary to type up the information from Barton's inspection reports at a time when McKinney was the supervisor and instead of using Coger Lee's name the secretary mistakenly had put McKinney's name on them. Kralovec testified that the secretary he thought was responsible had died by that time, however, and therefore could not be questioned.

Kralovec also identified a February 1986 letter he had written to Maureen Connors, questioning the McKinney memos that Connors had forwarded pursuant to discovery requests and asking her help in finding out from the Park District what had happened. At the hearing in this case, Kralovec said that as of February 1986 he had no question as to the credibility of any of the documents other than the McKinney memos.

In the spring and summer of 1986, Brant and Kralovec continued discussing the case and the money it would take to settle. As of August 1986 the on-going settlement discussions had borne no fruit. Brant's evaluation of his own client's exposure was $400,000 and he continued to advocate the equal sharing principle between codefendants. In an in-house memo assessing the case, Brant reviewed the law and stated his belief that a jury's verdict would be in the million dollar range because in a similar case involving a nine-year-old boy, the jury had awarded over a million and found the boy only 18% contributorily negligent. Accordingly, Brant recommended that CNW offer $400,000, to be matched by codefendant for a total of $800,000. By late 1986, however, pretrial conferences had yielded no settlement and the parties were given a March 30, 1987, trial date.

In February 1987 Kralovec and Brant discussed the terms of a written sharing agreement and exchanged drafts. Brant testified that during this time he apprised CNW's excess insurance carrier of the arrangement, anticipating that they would also sign it.

While the sharing agreement was being drafted and revised, the parties continued preparing for trial. Defendants' motions for summary judgment were denied. Engel's attorney, Howard Schaffner, re-

minded Kralovec he wanted originals or legible copies of the Barton inspection reports as well as other documents including monthly reports showing the work done by the Park District. In a letter dated March 24, 1987, Kralovec relayed Schaffner's request to Maureen Connors. Two days later he informed her by letter that he thought he had figured out the "mystery" of the McKinney memos. Since the type-written letters were identical to Barton's hand-printed reports to Coger Lee, bearing the same dates, Kralovec surmised, "Obviously, someone, maybe senior to Barton gave the order to Barton's secretary or some other secretary to type the four involved memos from Barton over the name of McKinney. \*\*\* [T]his matter can now be tracked down to find out who did the typing of the memos and who gave the order to type the memos. When this information is learned, I think much of the incriminating nature of the four unexplained typed memos will have been expunged. All of the information in the typed memos was originally contained in Barton's own hand-printed memos."

Meanwhile, Brant was also reviewing the discovery materials in preparation for trial. He thought the McKinney memos were explainable on a theory similar to Kralovec's, but involving a nonsecretarial employee who might have asked for a summary of the inspection reports *after* the Engel accident, just to confirm that the reports had in fact been made and kept. In a memo of March 24, 1987, Brant expressly rejected the inference of an attempt to "defraud" on the part of the Park District, noting that if you are going to defraud you do not involve people who are not in on the "fix." He reasoned that McKinney obviously was not in on any "fix" because he had steadfastly denied authoring the memos that bore his name.

In the same memo Brant noted some confusion over whether and when the fence was repaired. One of the repair and work memos, written by Frank Barton and dated August 27, 1981, reflected that the fence was "o.k." on that date. Because the fence was open when the Engel accident occurred the following month, the August 27 memo was very important. It would tend to greatly strengthen the Park District's defense that it had acted reasonably in maintaining and repairing the fence; the inference would be that the fence was opened again by vandals just days or weeks before the accident. Brant went on to note that if the fence were repaired in August 1981 as indicated in the memo, there was a further question raised by an October 1981, post-accident memo in which Barton stated that he had asked for the fence to be repaired "3 times."

Brant testified, as did Kralovec and Connors, that he believed the Barton memos were genuine inspection reports reflecting the condition of the park on the dates in question. In Brant's view, the main problem throughout discovery had been obtaining complete documentation in a timely manner; discrepancies and conflicts in evidence were to be expected.

Brant testified that the six Barton "originals," which he had never even seen until the trial on the sharing agreement, were the only originals in the file. When he finally saw them he, too, could see that there was a serious problem with their appearance. Had he known what the Bartons had done he would never have considered entering an agreement with the Park District because the falsification of business records totally destroyed the credibility of the Park District's witnesses regarding the fence. Brant said the Barton documents were critical to the case because they were offered to support Barton's oral testimony and the ironworkers' testimony that they had fixed the fence.

Howard Schaffner, plaintiff's trial attorney, testified that he was suspicious of some of the Barton inspection reports because they could not be reconciled with other Barton reports and other evidence. He was prepared to raise credibility questions regarding the content of the McKinney and Barton documents before he discovered the actual falsification of the recreated "originals," but he admitted that obtaining the fakes "made the argument much easier."

In April 1990, while the case was still pending, the Park District's Board of Commissioners adopted a resolution for the first time ratifying the alleged sharing agreement between the Park District and CNW.

## OPINION

At issue is the creation and enforceability of a contract between two defendants to share equally in the payment of compensatory damages awarded to John Engel in connection with the personal injury lawsuit. In our view, the dispositive issue is whether the proven fraud operated to vitiate the contract or excuse its performance.

I

## CONTRACT FORMATION

The trial court first held that the sharing agreement dated March 23, 1987, was a binding offer from CNW that was accepted by the Park District and Cal Union no later than March 26, 1987. The trial

court found that after the exchange of earlier drafts and the inclusion of certain revisions, Brant had made a "valid offer" when he transmitted four duplicate originals to Kralovec, who was to obtain signatures from Cal Union and the Park District. The offer was accepted when the two parties executed the agreement. The court also found that the approval of CNW's excess insurance carrier was not proved to be a condition precedent to the formation of the contract. Likewise, CNW's signature on the written agreement was not a condition of the contract.

■■ The record supports the court's findings on the parties' contractual intent. CNW and the Park District, from an early point, had discussed the defensive strategy of concentrating on the plaintiff's conduct and avoid accusing each other of negligence. To that end, the lawyers agreed to refrain from filing counterclaims against each other; instead, they would cooperate in the defense and share responsibility for whatever settlement or judgment damages Engel might recover against one or both of them. Over a period of a few weeks just before the trial was to begin the parties exchanged proposed drafts of the sharing agreement. Based on the agreed terms, Brant then sent out duplicate originals to be executed. As the trial court concluded, by this conduct CNW made a valid offer that was accepted by the Park District and Cal Union before it was withdrawn.

The record also supports the trial court's finding that the approval of CNW's excess insurer was *not* a condition of the contract. The March 23 agreement contained no express or reasonably implied condition to that effect and there was no signature line for the carrier. Although the evidence showed that Brant did notify CNW's excess insurer about the agreement and anticipated its approval, Brant did not tell the Park District or Cal Union that such approval was required. Nor did they agree to such condition. Similarly, CNW's signature was not shown to be a condition precedent of the sharing agreement, and therefore, its absence does not defeat the formation of the contract. See *Soderstrom v. Rock River Valley Pigeon Club, Inc.* (1984), 122 Ill. App. 3d 819, 461 N.E.2d 547.

CNW argues, however, that the sharing agreement was void under a Park District ordinance because certain procedures were not followed and the assistant general attorney, Maureen Connors, lacked authority to bind the Park District to the settlement. The basis for this contention is section 12—4(j) of the Chicago Park District Code, which states:

> "The general attorney shall have authority to make settlement of all accounts, claims and suits; provided, however, that

each such compromised account, claim or suit and settlement thereof does not diminish the original claim, account, or suit by one thousand dollars ($1,000) and if so the settlement shall be subject to the approval of the board of commissioners. In event of approval of the settlement, the general attorney shall make a report thereof to the board of commissioners." Chicago Park District Code §12—4(j).

This less than illuminating provision was discussed at some length by the court and the attorneys. After admitting to some confusion over the interpretation and applicability of the provision, the trial court ultimately rejected CNW's position that the sharing agreement was void on the procedural grounds that board approval was a condition precedent to its legal effect. The court also found that Connors was authorized to execute the agreement.

■ We cannot say that the court was incorrect in its ruling on this matter. CNW's analysis of the ordinance is unsatisfactory, moreover. To the extent CNW argues that Connors, as *assistant* general attorney, lacked power under the ordinance to sign for the Park District, we disagree. The record indicates that she sought and received permission from the general attorney. Her authority to sign on behalf of the Park District was not questioned at the time the parties were reducing the agreement to writing, and if the settlement were in fact subject to board approval, there is nothing to indicate that the board would not or did not approve. In fact, the board did ratify the sharing agreement by resolution, albeit some three years after the fact.

For CNW's argument to prevail, then, CNW must demonstrate that the agreement was void *ab initio* because Connors lacked legal authority to bind the Park District to the settlement without board approval. CNW's case citations do not support that position, however. In *Ad-Ex, Inc. v. City of Chicago* (1990), 207 Ill. App. 3d 163, 172, 565 N.E.2d 669, 675, for example, the court noted that "[a] municipal contract which is legally prohibited or beyond the power of the municipality is absolutely void and cannot be ratified by later municipal action. [Citation.] However, where the contract is within the corporate powers, but merely defectively or irregularly made, the municipality may not avoid it on the grounds that it exercised it irregularly ***." In the pending case the power of the Park District to settle claims and litigation is not in question. The general attorney consented to Connors' signing the agreement on behalf of the Park District. Moreover, CNW has not effectively explained why the agreement would not be binding simply because the board of commissioners had not formally approved it before it was entered. Within a few days after ten-

dering the offer, CNW attempted to withdraw it and told the Park District it did not consider itself bound. Under these circumstances board approval would have been pointless.

We conclude that the trial court did not err in holding that the parties intended to and did enter into an agreement to equally share the cost of settlement or verdict.

## II

CONTRACT PERFORMANCE/ENFORCEMENT

The question then becomes whether the March 23 sharing agreement should be rescinded or deemed unenforceable because of the concealed fraud. Alternatively, CNW raises the unclean hands doctrine.

The trial court concluded that CNW had failed to prove fraud by clear and convincing evidence, primarily finding that Brant did not reasonably rely on the Barton documents or their genuineness when he entered into the sharing agreement. The court cited Brant's awareness of on-going problems with the Park District's discovery responses in the *Engel* case and observed that as a "seasoned" trial attorney, Brant had reason to question the accuracy of the discovery as it unfolded. Before focusing in on this issue—whether Brant reasonably relied on the Park District's discovery responses—we note that the existence of falsified evidence in the *Engel* lawsuit is a serious matter, of the type that we would hesitate to view as part of the contractual risks CNW knowingly undertook when fashioning the sharing agreement. The March 23 agreement was based on defendants' sharing in the responsibility for negligent—not fraudulent—conduct.

Without question, a species of fraud was perpetrated in this case, and not by CNW. The record is uncontroverted that Barton lied during the *Engel* trial regarding the preparation of the six "original" inspection reports. Thereafter, Barton admitted his false testimony to Kralovec, acknowledging that he had directed his wife to create two years worth of reports all at one time, during the pendency of the *Engel* lawsuit. Kralovec related this information to Cal Union and the Park District, but nevertheless went ahead with the trial. The *Engel* record was never corrected. Schaffner, however, was able to dramatically demonstrate through his expert that the Barton reports were not in fact genuine business records and that Barton, therefore, had lied when he testified to the contrary. On appeal, the Park District urged this court to reverse the judgment because of Schaffner's success in doing just that and thereby "fueling" the jury's anger. Now, in

the pending case, the Park District concedes that it had produced false documents during discovery but claims that Brant, too, was on notice of the problem and chose to enter the sharing agreement anyway.

To adopt such an approach is to overlook two important considerations. First, the proper analysis of how fraud affects or discharges a contractual obligation is not identical to the classical tort definition of fraudulent misrepresentation as a cause of action to recover damages. (See 12 S. Williston, Contracts § 1515C, at 495 (3d ed. 1970) ("Whatever may be the rule with reference to recovery of damages for tort, fraud, with reference to avoidance of contractual obligations, should be given a wider meaning"); compare *Pinelli v. Alpine Development Corp.* (1979), 70 Ill. App. 3d 980, 1000, 388 N.E.2d 943, 957 (affirming rescission of a contract for the sale of stock when defendant misrepresented facts) ("[r]escission is an appropriate remedy when there has been *some fraud* in the making of a contract" (emphasis added)), with *Seefeldt v. Millikin National Bank* (1987), 154 Ill. App. 3d 715, 506 N.E.2d 1052 (listing five elements a party must prove to recover damages arising out of alleged fraudulent representation).) The tort of fraud and the contract defense based on fraud address different concerns.

Second, the integrity of our discovery system may be jeopardized if the party directly responsible for producing what turns out to be faked records may nonetheless benefit from the failure of the recipient to discover the falsification. " 'Something more than the morals of a medieval market place may reasonably be expected in the conduct of litigation.' " *Elfman v. Evanston Bus Co.* (1963), 27 Ill. 2d 609, 615, 190 N.E.2d 348, 351, quoting *Jansma Transport, Inc. v. Torino Baking Co.* (1960), 27 Ill. App. 2d 347, 354; accord *Ostendorf v. International Harvestor Co.* (1982), 89 Ill. 2d 273, 285, 433 N.E.2d 253 (As a matter of law, a litigant's failure to comply fully and truthfully with discovery requests constitutes fraudulent concealment for purposes of tolling statute of limitations); see also *Lubbers v. Norfolk & Western Ry. Co.* (1985), 105 Ill. 2d 201, 211, 473 N.E.2d 955; *In re Estate of Soderholm* (1984), 127 Ill. App. 3d 871, 469 N.E.2d 410 (Default judgment entered as discovery sanction was affirmed against party who fabricated self-serving diaries and lied under oath).

CONTRACT ANALYSIS: MATERIALITY OF PREVIOUSLY UNDISCLOSED
BARTON ORIGINALS TO RISKS UNDERTAKEN

We must, of course, evaluate the contract issues in light of what was known to the parties at the time the agreement was entered into.

At that time, just days before the *Engel* trial, discovery was closed. In preparing for trial and evaluating settlement proposals, *all* counsel relied on the discovery which had taken place. That discovery included the unexplained McKinney memos and photocopies of the Barton inspection reports.

According to the record, none of the attorneys involved knew that the Barton originals had not been prepared in the ordinary course of business. Kralovec testified as to his belief throughout the *Engel* discovery that the Park District's memos and documents were true and accurate and had been prepared at or about the time the inspection reports were actually made. He relied on the documents in assessing both the Park District's potential liability to Engel and his client's *pro rata* share of responsibility under the sharing agreement.

Judge Maureen Connors, the Park District's assistant general attorney during the *Engel* case, testified that as of the beginning of trial she had fully and honestly complied with all production requests. She said she believed that the documents that she was responsible for collecting from Park District personnel and forwarding to Kralovec had been prepared in the ordinary course of business on or about the dates they bore.

Howard Schaffner, Engel's attorney, also relied on the same discovery in preparing for trial and evaluating the codefendants' settlement offers. While he testified he did not believe all of the Barton documents could be *accurate* because of other evidence in the case, he took into account all known factors that would influence his settlement demand at the beginning of trial. At that time, Schaffner's valuation of his case was $900,000.

The only evidence not previously known to the attorneys or produced during discovery were the six Barton "originals." When Kralovec turned them over to Schaffner after the start of trial, Schaffner took one look at them and more than doubled his demand for settlement. He also engaged a documents examiner and then dismissed CNW from the lawsuit entirely, notwithstanding the fact that nothing at all had changed with respect to CNW's liability in negligence.

■ In our view, Schaffner's reaction is the most persuasive proof of the materiality of the Barton "originals"; his vastly increased demand indicates a material change in his position. Brant, too, undoubtedly would have similarly reassessed CNW's position with respect to the sharing agreement had he known of the fakery. (See 12 S. Williston, Contracts §1515C, at 495 (3d ed. 1970) quoting Restatement of Contracts §470, at 891 (1932) (" '[M]ateriality' [of fraud as a defense to contractual obligation] should be given its natural meaning as

'likely to affect the conduct of a reasonable man' ").) We conclude that knowledge of the faked originals, as measured by its effect on the conduct of a reasonable person, must be deemed material under the facts of this case. No evidence of record suggests a contrary conclusion.

FRAUDULENT MISREPRESENTATION ANALYSIS: MATERIALITY OF FAKED
EVIDENCE AND REASONABLENESS OF RELIANCE THEREON

As the above analysis suggests, the ultimate question in this appeal is whether the falsification of the Barton reports, unknown to any of the attorneys at the time the sharing agreement was entered, constitutes fraud of sufficient magnitude to prevent enforcement of the contract. The trial court concluded that it did not, primarily because of the reliance element. While we owe great deference to the findings of the able and experienced trial judge, the record shows that the key facts are not in dispute. Accordingly, we must reverse if the factual findings are against the manifest weight of the evidence or the record compels a contrary conclusion. (See *Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 195, 538 N.E.2d 530.) We believe that the record does compel a contrary conclusion, particularly in light of our view that CNW's assessment of the case was based on defendants' liability in negligence, and did not include faked evidence as part of the contractual risks it was undertaking. Nonetheless, we address the trial court's analysis under the tort definition of fraud because it is clear from the judge's opinion that he did not find Brant's reliance on the Park District discovery justifiable.

The trial court defined the elements of fraud as "a false statement of [material] fact, made intentionally or with a reckless disregard for the truth; reasonable or justifiable reliance which proximately causes damage." The false statements of fact are the six Barton originals and the accompanying trial testimony as to their authenticity. The intent to deceive was admitted when Barton told Kralovec he had his wife create them all at one time for purposes of the trial. In light of Barton's admissions, it is difficult to imagine a more clearly proven falsification of evidence than exists in this case. The existence of intentionally false statements, therefore, does not rest on a determination of witness credibility or disputed facts.

In its written opinion the court made a distinction between fraud in the *content* of the Barton records and fraud in the *method of their preparation.* As to the factual content of the records, the court held that there was "no clear and convincing evidence that the Barton 'originals' (Defendants' Exhibit No. 98), even though not prepared

contemporaneously with the alleged inspections, actually misrepresented the condition of the fence on the dates in question." The court later restated its conclusion that "there was no clear and convincing evidence that the 'originals' actually fabricated the fact that the fence inspections were made."

The above ruling suggests that Barton's reconstruction of the originals should be accorded little importance in light of a lack of proof that the reports were false as to content, *i.e.*, that inspections were made and repairs undertaken. The falsity of the content, however, is precisely what the trial court held that Brant should have realized or could have discovered. The court found that Brant could not have relied on the accuracy of the Barton documents, stating, "The court does not believe that Brant could reasonably believe there *were not* serious doubts over the fact that the [Park District] inspected and repaired the fence."

■ We believe that the trial court erred in holding, on the one hand, that Brant could not rely on the truth or genuineness of the documents that were produced to him from the Park District, and, on the other hand, that there was insufficient evidence that those very documents were false as to content.

The trial court did find, and we agree, that the accuracy or reliability of the Barton evidence was material to the parties' trial strategy (and, by implication, the sharing agreement). In his personal injury lawsuit, Engel needed to prove that the Park District negligently maintained the fence through which he gained access to the trains. As the trial court in the pending case noted, the defense "centered around evidence of the [Park District's] employees making periodic inspections of the fence and, if needed, repairing it, as well as the alleged contributory negligence of the tort plaintiff in negating proximate cause." The court acknowledged that "discovery was typically conflicting, sometimes inconsistent and protracted." The court reasoned that the success of the defense "relied upon the testimony of the fence inspector, Barton," and therefore "whatever documentary evidence that corroborated or impeached the deposition testimony of Barton was important in evaluating defendants' exposure."

The evidence of record supports this observation. The trial court went on to trace the course of discovery problems that related to the ultimate negligence issue of whether the Park District regularly inspected and maintained its fence and whether the fence had been in a state of satisfactory repair shortly before the incident. In the fact portion of this opinion we have listed this material at length. The trial court then concluded that the inadequacy of the Park District's dis-

covery responses was enough to "raise a question in a trial attorney's mind about the accuracy of the discovery furnished" and "called into question the genuineness of the Barton records" before the sharing agreement was offered by CNW. As one example, the court cited Brant's memo of April 1984 in which he noted an inconsistency between deposition testimony that the Park District attached a high degree of importance to maintaining the fence and annual summaries for 1981 showing only post-accident fence repairs. In that same document, however, Brant expressly noted "much still to come, including *** work repairs and monthly reports."

Apparently, the trial court in the pending case inferred that because Brant noted problems of proof and unexplained discrepancies, he was on notice at least as far back as 1984 that the Barton reports were "not genuine." Specifically on this point, the trial court noted that in Brant's April 1984 memo, Brant asked these questions, "How does [it fit that an August 1981 Barton report shows the fence in satisfactory condition] when there is no showing of fence work until October-November? And why doesn't [Barton] mention the fence in his September 1981 report as pro or con? And why does [Barton] say in October, 1981 in the letter to his boss, post-accident, that the fence had holes in October despite his three previous requests for repairs?"

From our review of the record, we note that the group of Barton memos referred to above caused continuing confusion over the actual condition of the fence both before and after the September 1981 accident. These memos were the specific subject of at least one in-chambers conference during the *Engel* trial. During a break in the questioning of Frank Barton, Schaffner requested the court to permit him to question Barton regarding the October 1981, post-accident memo. Schaffner wanted to ascertain when Barton made the referenced three "previous" requests for repairs, before or after the September accident. Kralovec objected to the admissibility of anything that would show that the Park District repaired the opening in the fence *after* Engel was injured. Schaffner responded that he needed to probe the date of the requests for repair because if the jury believed the August 1981 memo that the fence had been in good repair on that date, a few weeks before Engel was injured, it would devastate the "heart of his case": the jury might infer that the fence had once again been cut open shortly before the accident and therefore the Park District was not negligent. The court allowed Schaffner to question Barton, outside the jury's presence. Barton said that it was in a few-week period after Engel's accident that he had made three oral requests for crews to fix the fence.

The significance of the parties' continuing discussion of the Barton reports is this: the reports, however internally inconsistent or questionable in some respects, were nonetheless relied on by all of the attorneys in evaluating the ultimate factual question of whether the Park District was negligent in maintaining the fence. That question, of course, was to be answered by the jury, based on the same evidence as produced in discovery, subject to the rules of evidence. Barton's credibility was important because, as Schaffner feared, if the jury believed his August 1981 memo, it might find that the Park District had not acted unreasonably in maintaining the fence. Therefore, when Schaffner learned that the Barton "originals" had been faked, it not only made his case "much easier," it allowed him to expose Barton as a perjurer and destroy his credibility.

What Brant knew when he entered the sharing agreement was that the Barton inspection reports were vague, confusing, and inconsistent with other evidence. That knowledge properly figured into the attorneys' assessment of their proofs of negligence. However, we cannot agree that Brant was on notice of what even Schaffner learned almost by accident: that at least six of the Park District's "original" records were counterfeit. That revelation dealt a crippling blow to the defense, which was based on regular inspections and reasonable maintenance; if the documents themselves were *fakes*, why should the jury believe *anything* the Park District said in defense of its practices and procedures?

Brant testified that he would not have entered the sharing agreement if he had known what the Bartons had done. The trial court was not required to believe Brant's statement on that issue. Nevertheless, Brant's reliance on the *authenticity of the reports as business records produced during discovery by the Park District's attorneys* appears reasonable given the uncontradicted evidence on that issue. Connors, the attorney responsible for obtaining the documents from Park District personnel in the first place, testified that she believed the Barton reports to be genuine business records. Kralovec, the Park District's trial attorney, also testified as to his belief in the authenticity of the documents. Schaffner, plaintiff's attorney, and the one most keenly interested in demolishing the Park District's evidence, may not have thought the documents accurate or authentic, but he, too, had relied on them in formulating his $900,000 settlement demand. After one look at the "originals" he knew his case had just doubled in value. We cannot find any ground upon which to assume, as the court presumably did, that Brant should have believed that the Barton photocopies he saw in the years before trial had been manufactured for trial and

were fakes. While litigants must pursue discovery with diligence, we do not believe they are on notice of forged or falsified materials that are produced by parties or witnesses not in their control. See, *e.g., Gerill*, 128 Ill. 2d at 195, 538 N.E.2d at 537 (a party's reliance on another's misrepresentations may be reasonable if the other party has control over information produced).

Although the trial court in the pending case determined that CNW's attorney was on notice of continuing problems with the Park District's discovery, we do not believe that Brant's questions or suspicions regarding the quality of the Park District's discovery responses equates with actual, demonstrable proof that Barton was lying in his deposition or had falsified documents. Therefore, we hold that Brant's reliance on the authenticity of the inspection reports themselves was not unjustified; to the extent he lacked diligence or was negligent in failing to expose the fraud himself, that negligence is not an excuse for the fraud committed in this case. *Schmid v. Landfield* (1960), 20 Ill. 2d 89, 169 N.E.2d 229.

### III

The last issue pertinent to the appeal is whether Barton's fraud can be imputed to the Park District. The court stated that Barton's "alleged fabrication of inspection reports" could not be imputed to the Park District, noting that Barton's probable motive was to protect his job. The court nonetheless characterized its own ruling on that point as "gratuitous" because of its "conclusion that there was no clear and convincing evidence that the 'originals' actually fabricated the fact that the fence inspections were made."

We cannot agree with a ruling that allows a litigant to disclaim responsibility for its own business records and other evidence that was produced in accordance with discovery requests and reviewed by its own lawyers. In this case, two attorneys for the Park District were directly involved in and charged with the production of documents. While we have no quarrel with the trial court's finding that there was no evidence of actual fraud on the part of the two individual attorneys for the Park District, that is not really the issue. Even though the attorneys disseminated the false evidence "innocently," when damage results from another's acting thereon, "who should bear the loss?" (See 12 S. Williston, Contracts §1510, at 462 (3d ed. 1970).) Attorneys or agents who respond to discovery requests must search the "corporate memory" by investigating the records available and attempting to ascertain the knowledge of other corpo-

rate agents. *Campen v. Executive House Hotels, Inc.* (1982), 105 Ill. App. 3d 576, 587, 434 N.E.2d 511, 518.

An entity acts through its agents, and when those agents produce falsified business records, the rights of other parties should not be thwarted simply because the false evidence was "innocently" forwarded through discovery channels. Barton's records and testimony formed a key part of the Park District's defense which, if successful, would have benefitted the Park District. Moreover, here the Park District and Cal Union remained silent after Barton admitted to the falsification of evidence, presumably because correcting the record during the trial would hardly advance their interests. We will not condone a litigant's disclaimer of legal responsibility for its own evidence produced through discovery. See *Sunseri v. Puccia* (1981), 97 Ill. App. 3d 488, 493 N.E.2d 925; see also *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 196, 380 N.E.2d 1040.

In our view, the fraud that was perpetrated during discovery taints the alleged sharing agreement beyond redemption. Brant, as counsel for codefendant, did not control the witness or the discovery and did not participate in the trial in which the Park District attorneys failed to correct the Barton evidence after being apprised of its admitted falsity. We find it a curious result that the Park District and its attorneys should be excused from the consequences of Barton's fraud in the context of this lawsuit while CNW and Brant are not.

Had the Park District filed a timely claim for statutory contribution it could have preserved a claim for at least a portion of the judgment it paid to Engel. We are left with the case as presented to us, however, and after carefully reviewing the entire record and pertinent authorities we hold that the trial court's order enforcing the sharing agreement is clearly erroneous. Accordingly, we reverse the judgment entered against CNW and in favor of the Park District.

Reversed.

JIGANTI, P.J., and CAHILL, J., concur.