In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3693

DAVID P. LEIBOWITZ, Trustee
for the benefit of creditors in
Goldblatt's Bargain Stores, Inc.,

*Plaintiff*,

*v.*

GREAT AMERICAN GROUP, INC.,

*Defendant-Appellant,*

*and*

LASALLE BANK, N.A.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3025—**David H. Coar**, *Judge*.

ARGUED SEPTEMBER 18, 2008—DECIDED MARCH 18, 2009

Before EASTERBROOK, *Chief Judge*, and SYKES and TINDER,
*Circuit Judges*.

EASTERBROOK, *Chief Judge*. Goldblatt's Bargain Stores
operated six outlets in the Chicago area. All were closed

as part of Goldblatt's bankruptcy. In January 2003 Great American Group agreed to buy the inventory at two of these stores for approximately 45% of what Goldblatt's had spent for the merchandise. Great American Group paid approximately 75% of the agreed amount before taking possession. Later Washington Inventory Service was to determine the value of the inventory. If it was worth at least as much as Goldblatt's had represented, then Great American Group was to pay the remaining 25% of the price; if it was worth less, then the final price would depend on Washington Inventory Service's appraisal, and Great American Group might be entitled to a refund. Because LaSalle Bank, Goldblatt's principal creditor, had a security interest in the inventory, the transaction was contingent on LaSalle's approval, which was given.

Before the transaction closed, Great American Group learned that Goldblatt's had moved some inventory from the four operating stores to the two that were to be liquidated. Goldblatt's had paid its suppliers some $450,000 for these goods. Great American Group did not tell LaSalle Bank about this transfer. Washington Inventory Service concluded that the inventory on hand when Great American Group took over these two stores was worth at least as much as Goldblatt's had represented. Great American Group paid the rest of the price, and it made a profit on the sale of the stores' contents to the public.

In February 2003 Goldblatt's decided to close the four remaining stores. Again Great American Group purchased the inventory at a price based on Goldblatt's estimate,

subject to a settling up after Washington Inventory
Service appraised the inventory. Again LaSalle Bank
consented and promised to indemnify Great American
Group if Goldblatt's could not make good on any obliga-
tion. After Great American Group had paid, however,
Washington Inventory Service concluded that the inven-
tory was worth at least $2 million less than Goldblatt's
had estimated. This finding entitled Great American
Group to a refund of approximately $1 million. The bank-
ruptcy estate could not pay, having turned the money
over to LaSalle Bank. And LaSalle, though required by the
contract to pay, refused to do so. It insisted that Great
American Group had committed fraud by failing to
reveal the transfer of inventory from the four February-
closure stores to the two January-closure stores.

Bankruptcy Judge Wedoff held a trial and concluded
that Great American Group had a duty to reveal the
transfer of inventory. He reached this conclusion under
Illinois law (which the parties agree is applicable), as
summarized by this court:

> An omission can of course be actionable as a fraud.
> But not *every* failure by a seller (or borrower, or
> employee, etc.) to disclose information to the
> buyer (or lender, or employer, etc.) that would
> cause the latter to reassess the deal is actionable. A
> general duty of disclosure would turn every bar-
> gaining relationship into a fiduciary one. There
> would no longer be such a thing as arm's-length
> bargaining, and enterprise and commerce would
> be impeded. The seller who deals at arm's length

is entitled to "take advantage" of the buyer at
least to the extent of exploiting information and
expertise that the seller expended substantial
resources of time or money on obtaining—other-
wise what incentive would there be to incur
such costs? But when the seller has without sub-
stantial investment on his part come upon material
information which the buyer would find either
impossible or very costly to discover himself, then
the seller must disclose it—for example, must
disclose that the house he is trying to sell is in-
fested with termites. The distinction between the
two classes of case is illustrated by *Lenzi v. Morkin*,
103 Ill. 2d 290, 469 N.E.2d 178, 82 Ill. Dec. 644
(1984), where the failure to disclose an assessor's
valuation was held not to be actionable, since the
valuation was a matter of public record and there-
fore ascertainable by the buyer at reasonable cost.

*FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 619 (7th Cir. 1989)
(emphasis in original; most citations omitted with-
out indication). See also Anthony T. Kronman, *Mistake,
Disclosure, Information, and the Law of Contracts*, 7 J. Legal
Studies 1 (1978). The bankruptcy judge concluded that
Great American Group had learned the information
without making any extra effort or investment, and that
LaSalle Bank could not have discovered the facts without
costly inquiry. So disclosure was required, and silence
was a fraud. But the judge also concluded that LaSalle
Bank would not have acted any differently had it known
of the transfer: It still would have approved Goldblatt's
decision to sell its remaining inventory to Great American

Group. Finally, the judge concluded, LaSalle Bank had not shown any loss from the fact that the inventory was in the first group of two stores rather than the second group of four stores. The court entered a judgment of approximately $1.09 million in Great American Group's favor.

On appeal under 28 U.S.C. §158, the district court reversed. It agreed with the bankruptcy court that Great American Group owed the Bank a duty of disclosure and committed fraud by remaining silent. It rejected Great American Group's argument that the transfer was not material because it represented less than 10% of the inventory at the second group of four stores. But the district court, unlike the bankruptcy court, thought that fraud vitiated the contract and thus excused LaSalle Bank from any obligation to perform. 2007 U.S. Dist. LEXIS 75633 (N.D. Ill. Oct. 10, 2007).

The district court complicated the case by stating that the "matter is remanded to the Bankruptcy court for further proceedings consistent with the terms of this opinion and order." A remand from a district court to a bankruptcy court is canonically not appealable, because it does not finally resolve the dispute. See, e.g., *In re Comdisco, Inc.*, 538 F.3d 647 (7th Cir. 2008). Appeal must wait for the events on remand, which will tie up loose ends. But, as far as we can tell, nothing has actually been remanded in this case. The bankruptcy judge entered a money judgment, which the district judge reversed; there is nothing more for the bankruptcy judge to do. The "remand" in the district judge's opinion seems to have been an inapt entry from a word processor's store of

standard phrases. This dispute is over; the decision is final, and we have jurisdiction.

There is a second jurisdictional issue. LaSalle Bank contends that, even though we may have appellate jurisdiction, the bankruptcy court lacked subject-matter jurisdiction because the dispute was not related to the bankruptcy. See 28 U.S.C. §157(a). Yet the sales were authorized by a bankruptcy court; the principal obligor, Goldblatt's, is a debtor in bankruptcy; the reason why Great American Group sought to recover from the Bank was that the Trustee for Goldblatt's had distributed the proceeds of the sale before Washington Inventory Service completed its valuation. Another option would have been for the bankruptcy court to enter a judgment against the estate in bankruptcy and insist that the Trustee attempt to recover that amount from the Bank. How much money is available for other creditors depends on the disposition of this proceeding, which is an integral part of Goldblatt's bankruptcy. Jurisdiction under §157(a) cannot reasonably be doubted.

The district judge approached this dispute as if LaSalle Bank wanted rescission. A victim of fraud is entitled to set aside the contract and have everyone's interests restored to the state preceding the fraud. See *Eisenberg v. Goldstein*, 29 Ill. 2d 617, 195 N.E.2d 184 (1963); *Restatement (Second) of Contracts* §§ 470–511. But the Bank does not want rescission; it does not want the inventory back, so it can be sold through a different liquidator; the Bank certainly does not want to restore the payment it received for the inventory. What it wants instead—what

the district court gave it—is a right to keep all of the bargain's benefits while avoiding the detriments. That sort of outcome is not a "remedy" of any kind. The fraud could not have cost the Bank more than $200,000 (the original price of the transferred inventory, multiplied by the fraction of that price available in a liquidation sale) and likely cost it much less (since Great American Group bought the transferred inventory as part of the transaction for the first two stores). It is possible that the formulas used to determine what Great American Group paid for the first set of two stores differed from those for the second set of four stores, and these differences might have caused the shift of inventory to matter. But if there was any difference, LaSalle Bank has not tried to show it.

A legal remedy, whether rescission or damages, does not follow automatically from the existence of a false statement or material omission. There must be reliance, which is often called transaction causation, and injury, which is often called loss causation. See *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). (*Dura Pharmaceuticals* was decided under federal securities law, but Illinois and most other states also follow this approach. See, e.g., *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 776 N.E.2d 151 (2002); *Restatement (Second) of Torts* §§ 525, 546, 548A.) The bankruptcy judge found that LaSalle Bank had not demonstrated either transaction causation or loss causation. It tried to show reliance by contending that it would have insisted that Goldblatt's use a different liquidator had it known that Great American Group had failed to reveal a material fact. The bank-

ruptcy judge did not believe this, however, remarking that the evidence did not establish that any other firm would have offered the Bank better terms—and the Bank's obligations to its own investors demanded that it take the best deal available. LaSalle Bank did not even try to establish loss causation: It did not contend that the omission had anything to do with the sum that Great American Group wanted to recover, or that the movement of inventory among stores reduced the aggregate price received from the two sales to Great American Group.

The Bank would have had a better chance to show loss causation if Great American Group had *not* purchased the inventory from the second set of four stores, for then it could have gained on the first two stores without losing on the latter four. Yet the Bank does not seek to increase the compensation it received from the sale of the first two stores' inventory. Great American Group went ahead with the purchase of the second four stores' inventory despite knowing of the transfer. There's no reason why LaSalle Bank should be entitled to keep more than the contract specifies for this second transaction.

LaSalle Bank relies heavily on *Chicago Park District v. Chicago & North Western Transportation Co.*, 240 Ill. App. 3d 839, 607 N.E.2d 1300 (1st Dist. 1992), but in that opinion the court found that both reliance and injury had been established; in this case the bankruptcy court found after a trial that neither had been established. The bankruptcy court's findings are not clearly erroneous, so its decision must stand.

The judgment of the district court is reversed, and the case is remanded for reinstatement of the bankruptcy court's judgment.